GARRET GARRISON, appellant, *and* EXECUTORS OF PETER A. GARRISON'S WILL, respondents.

On a question of testamentary capacity, evidence of the opinions of witnesses, though competent, is merely preliminary to the further inquiry of the facts and circumstances upon which their opinions are formed.

It is not the *opinion* of the witness upon which the court relies, but the court draws its own conclusion, and forms its own judgment from the premises which have produced the conviction in the mind of the witness.

The mere opinion of a subscribing witness is entitled to no more weight with the court than that of any other witness.

The opinion of a witness who is a stranger to the testator, and who sees or hears nothing except what is necessary to enable him to attest the instrument as a subscribing witness, is not as much to be relied upon as that of a neighbor and familiar acquaintance of the testator. The opinion of neither is of any weight with the court, except as it proves itself to be a correct and sound conclusion from facts which justify and warrant it.

A man who will subscribe an instrument attesting that the testator is of sound mind, memory, and understanding, and then repudiate under oath his own attestation, does not occupy a position that will justify a court in giving any weight to his own opinion.

Garrison *v.* Executors of Garrison.

*A. B. Woodruff* and *W. Pennington,* for appellant.

*D. Barcalow* and *A. O. Zabriskie,* for respondents.

THE ORDINARY. This writing was propounded for probate, as the last will and testament of Peter A. Garrison, deceased, to the surrogate of the county of Bergen. A *caveat* was put in against proving it. A protracted investigation was had before the Orphans Court of the county, and that court unanimously admitted the will to probate. The caveators have appealed from this order of the Orphans Court to this court.

There are two objections made to the admission of the will to probate.

*First.* That the decedent had not sufficient mental capacity, at the time the paper was executed, to make a will.

*Second.* That either in consequence of fraud, mistake, or some circumstance beyond the decedent's control, the contents of the writing are not such as he intended they should be, and that therefore the writing is not the decedent's *will.*

This will was executed on the 26th of June, 1854. The decedent died, on the 23d day of July following, at the age of sixty-three or four years. The disease which caused his death was consumption, produced by the excessive use of ardent spirits.

As to the evidence of the general capacity of the testator for the ordinary business of life, we have the following facts, which are not controverted. He was the owner of a large farm, which he inherited from his father, in the county of Bergen, and another farm, of some hundred acres, adjoining the same, which he had acquired himself. He carried on the business of farming for some thirty-five years immediately preceding his death. He was the overseer of his own farm, and superintended and carried it on without the agency or aid of any one else. Most of the time his family consisted of several members. He was always the head of his family, and, as such, was always regarded and respected by its in-

mates.  He bought and sold both real and personal estate, made his own bargains, executed papers, kept his own accounts, invested his money and received the interest, and transacted all business appertaining to the management of his property and his domestic affairs without even the friendly advice or interference of any one.  During all this time there is no evidence of his ever having even once made, or of his having proposed to make an improvident bargain, or of committing a mistake of the most trivial kind in all these various transactions from which the inference could be deduced that he was not perfectly competent to their transaction. This superintendence and management of his affairs continued to the day of his death; and there is nothing in the case to show that any one, during his life, except one single individual, and he a mere passing acquaintance, expressed the opinion that he was not fully competent to manage his own affairs.  And yet many respectable witnesses testify that, during the few months preceding his death, and more particularly about the time of the execution of this will, he was not of sufficient mental capacity to transact business, and to dispose, by last will and testament, of that property which he was from day to day managing with prudence and judgment.  It is my duty, therefore, to look at the facts upon which such opinions are based, and to determine whether they justify the conclusion to which the witnesses have arrived.  The very best evidence of a man's capacity to dispose of his property by last will and testament is the fact of his management and disposition of it, in every other respect, with prudence and judgment.  It is difficult to conceive how it is possible for a man to have the sole control of his property, to buy and sell with judgment, and to dispose of the proceeds judiciously, and yet deny to him the capacity of saying how his property shall be disposed of when death deprives him of his personal control over it. The capability of the testator to discharge the duties of a public situation affords a strong presumption of his capacity to make a will.  *White* v. *Wilson*, 13 *Ves.* 87.

On both sides witnesses have been required to give their opinions as to the capacity of the testator. This evidence is competent; it is merely preliminary to the further inquiry of the facts and circumstances upon which these opinions are formed. It is not the *opinion* of the witness upon which the court relies, but the court draws its own conclusion and forms its own judgment from the premises which have produced the conviction in the mind of the witness. The mere opinion of a subscribing witness is entitled to no more weight with the court than that of any other witness. It is true he is called upon by the testator, as his witness of the execution of the instrument and of his competency to make a will, and the theory is, that " the attesting witnesses to a will are regarded in the law as placed around the testator in order that no fraud may be practised upon him in the execution of the will, and to ascertain and judge of his capacity." 1 *Jarman* 73. Our experience in these matters is sufficient to satisfy us that the subscribing witnesses seldom if ever take any pains to *ascertain* the capacity of the testator, and are generally those who know least of his general character and disposition or of his mental capacity. As a general thing, very little regard is paid by the testator to the character of the individuals who are called upon as the attesting witnesses to this most solemn and important act. Their duty is discharged by their formal attestation of the instrument; and any effort on their part to ascertain the state of mind of the testator, or the fact, whether he was the dupe of others who were more active in the transaction, and upon whom the testator was reposing his confidence, would be regarded as inquisitive, and as an unwarrantable interference with matters which did not concern them. The opinion of a witness who is a stranger to the testator, and who sees or hears nothing except what is necessary to enable him to attest the instrument as a subscribing witness, is not as much to be relied upon as that of a neighbor and familiar acquaintance of the testator. The truth is, the opinion of neither is of any weight with the court, except as it proves itself to be a cor-

z *

rect and sound conclusion from facts which justify and warrant it. A man who will subscribe an instrument attesting that the testator is of sound mind, memory, and understanding, and then repudiate under oath his own attestation, does not occupy a position that will justify a court in giving any weight to his mere opinion. A will may be sustained although all the subscribing witnesses depose to the incapacity of the deceased. *Le Breton* v. *Fletcher*, 2 *Hagg.* 568; *Lowe* v. *Jolliffe*, 1 *Sir Wm. Bl.* 365; *Shelford on Lunacy* 54, 55. And it is a frequent occurrence for a will to be refused probate, notwithstanding the strongest kind of testimony in support of the mental capacity of the decedent. I have thought proper to say more, as to the weight to be given to the evidence of a subscribing witness, than perhaps is called for by this particular case. But in several cases, lately argued before this court, an undue weight, it seemed to me, was attached to the opinions of subscribing witnesses, and an idea seemed to prevail that a court ought not to scrutinize as closely the facts from which such witnesses formed their opinions as those which were the base upon which the opinions of other witnesses rested. The observation of Swinburn is applicable to all witnesses—whether attesting or otherwise—"it is not sufficient for a witness to depose that the testator was mad or beside his wits, unless a sufficient reason can be given to prove this deposition, as that he saw him do such acts, or heard him speak such words, as a person having reason would not have done or spoken." *Swinburn* 72.

Let us examine with some particularity the testimony, in order to extract from it the facts and circumstances from which a conclusion is drawn unfavorable to the testamentary capacity of the decedent. I will take the witnesses upon whom the caveators mainly rely in resisting the proof of the will.

*Cornelius H. Van Houten* expresses the opinion that the testator was incompetent for business—that his faculties were pretty well destroyed—that his mind was gone. The witness

says he never had any business transaction with the deceased, and that his acquaintance with him was "a mere street or passing acquaintance." The foundation for this witness' unfavorable opinion was what occurred at two interviews between them. The first was in March or April, 1853, when they met at a vendue. The witness says, "he was alone, standing at the farm at a vendue at Van Embergh's; I walked up to him, and asked him how he got along; he shook his head, and said he did not know; then I told him he looked bad, and then he used the words again, *I don't know;* and then he told me he had lost his wife; I knew it before she was buried. Then he kind of made a motion with his hand, and acted very singular; but, says he, I am a speculator. What do you speculate in, I said. Well, says he, everything—so I looked at him and he began to grin. So then he asked me who I was; well, then I told him who I was. Well, he says, I don't know you; I then told him, if he did not know me, he did not know much at all." This singularity of conduct is accounted for by the witness himself. The witness discovered at once that it was the result of intoxication. He told deceased that he had been drinking too much, and walked away from him. The second interview referred to by the witness was in February, 1854, in Paterson. The deceased was with his black man, who, at the moment witness saw him, was helping deceased out of his wagon. Witness asked him how he did, when "he looked around kind of wild, and asked his black man who that was." The witness says, "*I saw he was pretty well drunk,* so I walked off, and I have not seen him since." The witness saw him at another time, when he does not say he was under the influence of liquor, and at that time he says he talked rationally. The witness says he formed his opinion from the talk and actions and peculiar laugh of the deceased; and yet, when he was sober, there is no pretence of his ever having exhibited to the witness any of these peculiarities. They were all perfectly natural to a man under the influence of liquor; and it is very manifest, from all the witness says,

that, according to his own observation, the actions and remarks which he considered as evidences of mental aberration were not observable when deceased was sober.

The next witness called upon by the caveators was James B. Beam. He was a nephew of the testator's wife, was in the habit of visiting the testator frequently; their families were on friendly terms. This witness testifies to many interviews between himself and testator, and details the conversations. They were upon the subject of the testator's property, his relations, and domestic concerns, and upon his intended disposition of his property. These conversations the witness testifies to as all perfectly rational, and as they are detailed by the witness they appear to be so. The witness does not mention one fact, during their long and familiar intercourse, from which the inference can be drawn that he was not of sufficient mental capacity to make a will. He says, "whenever I saw him he always talked rational." The witness does not express an opinion unfavorable to the testator's capacity. He says that deceased was an intemperate man, and that he never saw him when he had not been drinking more or less; that he had seen him when his drinking habits would not interfere with any particular business he might have on hand, and that he had seen him in liquor when he would consider him incapable of attending to any particular business. And the witness adds, "any man in liquor I consider incapable of attending to business; I don't know that it would interfere with his judgment particularly." He further says, he can't say he ever observed any particular change in testator's mind from the time he first knew him until the Monday previous to his death; and that he never saw him, when he was sober, that he was unfit to do business until up to the time of the Monday mentioned.

*Col. Josiah Beam,* whose sister the testator married, mentions no fact from which he is willing to infer the testator's incapacity. He had seen him when he was in great grief occasioned by the death of his wife. He would pull his hair, and say he was crazy, but at such times the conversations

they had together showed the testator was perfectly rational; he says he saw no change in the testator's mind up to June, the day before the will was made, and that he did his business as well as other men about the neighborhood. The witness saw him the day before the will was drawn, and says, that on that day he could not possibly have composed his mind so as to dispose of his estate, nor any other man in his situation. The witness describes that situation. It was great bodily suffering from the disease which had seized upon him; and the discomposure of his mind was owing to the suffering of the body.

*Rebecca Garrison* is the most important witness produced on the part of the caveators; and if she cannot state facts and circumstances connected with the deceased, from which the conclusion can be drawn that he had not sufficient mind to enable him to dispose of his estate with understanding and reason, then that fact cannot be established. She was the sister of testator's wife, and had lived in the family since the year 1850. Since the death of the testator's wife, in December, 1852, she had the charge of the domestic affairs of the family. She always ate with him at his table, conversed freely with him about all his business matters and his troubles, and was his only confidant after his wife's decease. She knew more about him than any other living person. She was a most willing witness on behalf of the caveators, and they have obtained from her, as a witness, the full benefit of all she knew to their advantage. The first circumstance the witness details was an occurrence in February, previous to the testator's death. As the testimony of this witness is so important, I shall, in referring to it, give the facts she states in her own language. She says: "the last of February of last year the testator left home to go to Bartholf's; the sun was about an hour high; I asked him how long he was going to stay; he told me he didn't know whether he would stay till bedtime or not; I told him I would wait, and would not go to bed until he came home; he said I must not be afraid; my son was with him. He

came home about seven o'clock in the evening; he came to the gate, and told my son uncle Peter was come; he stepped on the stoop, and knocked at the door; I never knew him to knock at the door before; I said come in; he opened the door, and came a little distance on the floor, and asked if he could stay there, and my boy told him yes, and he thought he was joking. He did not appear to be in liquor; he looked very wild when he came in, and asked if he could stay; he then turned round, and went out again, and went through the little gate again and big gate, and went up the road as fast as he could step. I told my son to go after him, and fetch him back; he went after him, and fetched him back in the house. He said, when he came in, he was not at home —it was not his house, it was other people's house. Then he took the candle, and opened the middle door, and went into the entry, and holding up the candle, and looking all about, he said, this is not my house, it is other people's house; and when he was alone in the entry I peeped in to see what he was doing, and he was talking to himself. In my opinion he was not in his right mind at all by his appearance. Then he came out of the entry, and went out of doors the second time; he came out of the middle door again, and said it was not his house, and he was going home. My son went after him again, for the second time, and got him by the corner of the granary, and asked him to come in. Testator then had a pen-knife in his hand open—it was a knife with two blades, and he had the big blade open, which was about as long as my finger; then when he came in he wanted to go off again, and said it was not me; it was not Beckey in the house. We wanted him to lie down—to go to bed. We could not, at first, get him to do so. He said he wanted to go home; he started up and looked at the bed, and said, this is not my bed—I am not going in that bed; so at last we got him to lay down, and after he was in, he wanted me to go to bed; I told him I could not, I had some work to do. I did not want to leave him alone there; I stayed with him until between three or four o'clock, and he

never closed his eyes in that time.   A little before the time
of which I have been speaking it seemed as if he was bewil-
dered in his head; he laid down, and asked me if I had any
eggs in the house; I told him I had, and he told me to get
one, and told me to crack it in a glass; I cracked it in the
glass, and gave it to him, and he drank it up.   He then said,
give me another one; and I gave him another one, and he
took it; he then asked for another one, which was the third;
he took that, and asked for the fourth, and took that; he
asked for the fifth one—I gave him the fifth one, and he took
that; he asked for the sixth, but did not get it.   John Bar-
tholf was there, and said, brother now stop, you have got
enough.   He seemed as if he was bewildered in his head.
The first day of March last he and I had been to Peter
Bush's.   I did not hear of anything until he stepped out of
the sleigh on his return.   He said his head felt so queer he
wanted me to help him in the bed as soon as I could, for it
seemed as though the house went all around with him, he
said; I got off his coat and boots—that was all I could get
off.   He wanted to lay down so, and I was chiefly all night
up with him.   He seemed very much bewildered in his head,
and was talking about everything; he was not drunk that
night."

We have here detailed by the witness all she ever heard
him say, or saw him do, during the period of the last four
years of his life, which was any evidence of unsoundness of
mind.   At most, it proves only that there were three nights
during the last four years of his life when he was out of his
mind.   The fact of the short duration of these attacks, not
lasting even until the following morning, proves beyond a
doubt the *general* soundness of the testator's mind.   But a
witness, John Bartholf, explains these circumstances detailed
by Rebecca Garrison, which show they were only temporary,
and were no evidence of a permanent unsoundness of mind.
It was at his house the testator was in February, as the
former witness alluded to.   He says he remembers the time;
that testator had drank a little too freely; that he had a

little too much when he came there. This, then, was nothing more than a fit of drunkenness, and not a fit of insanity. This witness was present, too, at the time of the testator's taking so many eggs. He tells us that the eggs were mixed with metheglin, and it is not surprising that six drinks in succession, without any interval except of time sufficient to prepare the drams, should produce a temporary aberration of mind and prostration of body. There were several other witnesses examined for the caveators, but they refer to no facts not already alluded to as having been detailed by other witnesses. Now it is quite impossible that the testator, during the last years of life, should have been so feeble in mind and body as to render him incapable of transacting business and unfit to dispose of his property, and yet Rebecca Garrison, with him almost every hour of those years, should not be able to mention any other facts from which such incapacity could be inferred. I do not refer to any other witnesses of the caveators, because they mention no other facts than are detailed in the testimony already examined.

It is very evident that there is nothing in the testimony, upon which the witnesses found their opinions of the incapacity of the testator, which should induce the court to hesitate in admitting the will to probate.

It is shown that the testator indulged to excess in the use of ardent spirits; that he was an habitual drunkard; that his body wasted away by degrees under the effect of this indulgence, and that it was the cause of his death. His mind sympathized with his body, and although excessive intoxication did not deprive him of the use of his understanding and reason, it greatly impaired them, and at times rendered him incapable of transacting any business. It is further insisted, that though it may be true that the deceased's general state of mind did not render him incompetent to make a will, yet that, at and about the time the will was executed, his mind was so debilitated, in consequence of the use of ardent spirits and his bodily infirmities, that he had not at that time sufficient reason and understanding to perform so important an

act as that of dictating and executing his last will and testament.

*Abram Garrison*, the first subscribing witness, lived within two hundred yards of him, and had always been acquainted with him. He says that, during the last three months of testator's life, there were times when he appeared as rational as ever he was, and then there were times when he did not appear fit to do business; that on the day the will was executed, he found him, as he expected to find him, in a weak condition; that he was standing and walking, was very weak; he did not speak, but only nodded assent to the questions asked; he appeared to know and understand what was going on and what he was doing. He says the will was executed in the middle of the day, and he don't think testator had been drinking any that day.

*James Bartholf*, another subscribing witness, had known testator about eighteen years. He says he conversed with him, at the time, about having some surveying done for one Carter, and testator remarked there were so many leaves on the trees he did not see how the line could be run, and he was not able to go himself and show the corners. He offered the witnesses something to drink; he got the bottle, set it down, and told them to drink; he either called or sent for water; he did not drink with them; he said he did not drink any then; he said he thought he had not tasted any in two weeks. The witness says: "he seemed to me, from his conversation and actions, to be in his usual mind and faculties as I had before seen and known him; from anything I saw or heard then, at that time, and from what I saw of testator before, I did not have any doubt, at that time, but that his mind was right, and that he was competent to make a will.'

Let us now see what transpired in reference to the execution of the will, and look at the conduct and actions of the testator about and immediately before and after its execution, for the purpose not only of ascertaining the state of mind of the testator, but also of seeing whether there is anything in the second proposition of the caveators that, in

consequence of some mistake, fraud, or accident, the contents of the writing are not such as the decedent intended them.

On the day before the execution of the will the testator was very ill, and evidently felt that his life was fast drawing to its close. Without the dictation or suggestion of any one, on the afternoon of that day, he sent for Henry I. Speer, who was the draftsman of the will. The next morning he complained of his head, and said to Rebecca Garrison, his housekeeper, that he was too confused in his head to do what he had to do on that day. This shows that he remembered the day's work he had marked out for himself, and an anxiety that it should be performed; it shows his retention of memory, and that his mind was occupied with the subject of the final disposition of his property. There is no evidence that he took any stimulating drink that morning, and we have his own declaration to one of the witnesses that he did not. He told Mrs. Garrison, on that morning, that he had sent for Mr. Speer to write his will, although he had not made known that fact the day before, when Speer was sent for. There was no secrecy about the transaction. Speer came after breakfast. The will was executed about noon. Speer and a stranger dined there that day, and after dinner the three walked out on the farm together. A Mr. Banta came there to get a cider barrel, and the testator gave directions to his black man John: where to find the barrel in the cellar, and cautioned him not to take one that was there marked with Van Dolson's name on it, and Mrs. Garrison says she did not see him do, or hear him say anything that day to make her think he was out of his head, except his remark, in the morning, that his head was confused. The evidence is very satisfactory that, on that day, he was entirely free from the effect of intoxicating drink, and that there was nothing said or done by him, on that day, to indicate that he did not enjoy, at that time, his ordinary strength and health of mind, memory, and understanding. When the will was executed, it was locked up in the bureau drawer, and the testator took the key. The next morning he gave Mrs. Gar-

rison the key, and told her to get the paper Speer had written the day before; he told her it was on the top of a little chest; the paper was handed to him, and he asked for his specs; Mrs. Garrison then left him, after telling him, if he wanted anything, to rap with his cane on the floor; he sat there nearly three hours, as the witness states; he knocked on the floor; Mrs. Garrison went up, and asked what he wanted; he then handed her the paper, and told her to put it away; she did so. Mrs. Garrison says she then asked "if it was wrote as he wanted it, and he said no, he could not make out one half of it, and what he could make out of it was not as he wanted it." The next day he wanted the will again, and Mrs. Garrison got it for him, and he examined it. She says she asked him if he was satisfied with it, and he said no, he was not—he could not make out one half of it to read it. The will was then put in the drawer, which was locked, and he put the key in his pocket. About a fortnight after this he sent again for Speer. He told Mrs. Garrison he wanted Speer to come and take care of it. Speer came there, and he and the testator were alone together. He dined there, and left in the middle of the afternoon. The witness, Mrs. Garrison, says they got the will, and sealed it up, and Speer took it home with him. Although the testator had before said that the will was not as he wanted it, there is no evidence that, after the will was sealed up and delivered to Speer, he ever made any complaint that it was not as he wished it.

This is certainly very strong evidence to show that the deceased executed this will with intelligence, and that the disposition of his property was made by this instrument as he desired it, without his being influenced or dictated to by any one. To corroborate this evidence of capacity, I will refer to a few only of very many particulars stated by the witnesses.

About the first of April, previous to his death, James B. Beam, a witness of the caveators, borrowed $500 of him. Testator told him that on the first of May he could let him

have all the money. He counted out $400, some in gold and some in paper, and gave Beam a note of $100, which he held against some individual. Beam took the money and note, and gave him his own note for it for $500. The note was endorsed by Mr. Beam's father, and testator said it was good, as in fact it was.. He transacted this business without any one's assistance.

On the sixth of June, previous to his death, he executed a deed for some land to Aaron G. Garrison, another witness of the caveators. Some fifteen months before, he had executed a deed for the same property to the father of Mr. Garrison, and held his note for it. The deed had not been recorded, and the old deed was cancelled, that a new one might be given to the son. Testator held the father's note, upon which interest had been paid. This note was delivered up, and a new one was given in place of it. This business was transacted by testator without any assistance and without his exhibiting any want of capacity.

On the eighth of the same month, Lewis White purchased of testator a yoke of oxen, a wagon, coal-box, and a sled. He paid $50 in cash, and gave his due-bill for $80, which was the balance. Mr. White says: "He went out with me to the barn, and showed me everything I bought of him; he fixed the price himself; there was quite a good deal of conversation between us respecting this purchase; he wanted to get a little more out of me for the things, and we finally agreed upon the price above expressed. At the time I saw no difference in his mind from what he had formerly been during my previous acquaintance with him; he then appeared in mind as I had always known him. After the eighth of June, I bought of testator some hay, corn, potatoes, butter, flour, and other small articles, between the eighth of June last and until within a day or two of his death. In all these business transactions I saw no want of mind or capacity to do business; he was as sharp to make a bargain the last transaction as he was at the first. A couple of weeks after the due-bill became due, which was the Wednesday previous

.to his death, I went to testator's house to pay the due-bill; at the time it became due I was sick, and could not get out of my house. On the Wednesday previous to testator's death, when I paid the due-bill, I found him pretty sick, but his mind was all right; he knew me, and gave me his hand at the bedside; I asked him how he did, and told him I had come to pay him the due-bill he held against me; he said it was all right. I owed him, at the same time, a good deal for articles my hands had got of him while I was sick, amounting to some $55. Before that I did not know how much I owed him for these things; after I paid the due-bill, I asked him how much I owed him for them; he said it was all down in his memorandum book, as he had kept an account of it; he told the lady that kept the house for him, whom I had heard called Beckey Garrison, to go and get the book; after he had told her where she would find it, she went and got the book; he spoke, and told me to look over and see if it was right as he had put it down, and if I found anything wrong he would correct it; I found everything right except the hay, for which I thought he had charged a little too much; he had charged me $15 per ton, and I could buy hay elsewhere for $10 per ton as good as his; I told him so; he said I must put it down at $10, and deduct the difference from the bill; I stayed that day until three or four o'clock, and then went home. The money I owed him I paid to him myself; he sat partially up in his bed, and he looked over it while I counted it over to him two or three times, and he appeared satisfied; the money was in two dollar bills; he handed the money to the lady who waited on him, and told her to put it in the box where she had got the note from, which she did."

*Jacob Gould* went to work for testator, on his farm, on the twenty-eighth of June, which was two days after the execution of the will, and worked for him till he died. The next week after Gould went there, testator went out in the field and showed him which piece of grass he should cut first, and how he should cut it. He gave directions what work was to

be done from day to day, and in the evening Gould would report to him what work he had done. He says he never saw him unfit to do business, except the last day of his life. On the fourth of July he settled with Gould.

The last of May he called upon a neighbor to go with him to New York to purchase fish; they went together to New York, and testator went to his cousin's, in Brooklyn, and stayed the night. He engaged the fish to be delivered in June, between the tenth and the fifteenth. On the sixteenth or eighteenth of June he went to his neighbor, who had been with him to New York, to see why the fish had not come. This neighbor says he transacted his own business, and that he saw no difference in him from former years, except that he had a severe cough.

In April, testator sold a farm for $5400. He entered into a written agreement, by which he was to convey the farm in consideration of $500 in cash, and a bond and mortgage for the balance. On the ninteenth of May the deed was delivered and the bargain consummated.

On the third of July, testator entered into negotiations with Mr. Waters for the sale of another farm : he walked out upon the farm, and named his price at $5000; an offer was made of $4000; they parted to meet for further negotiation next morning; they met, and a written agreement was signed by both parties, which was a sale of the farm at $4000, with the reservation of that year's crops, and testator to retain possession of the farm until the following February. On the fifteenth of July the deed was executed, and a few days afterward the papers were exchanged. All these negotiations were commenced and carried through, on the part of the testator, without the aid or advice of any one on his behalf; that the sales were judicious, as to price and every other particular, have not been questioned by any one.

*Elias Tolly* and *Albert Brown* were inmates of testator's family from the sixteenth of May, immediately preceding his death, until the twenty-first of June, which was five days previous to the execution of the will. They saw him daily,

and ate at the same table with him, and they never observed anything in his conversation or behavior to indicate that he did not enjoy the full possession of all his mental faculties.

But the caveators, as evidence of the incapacity of the testator, appeal to the contents of the will itself, and allege that they are such as to exclude the supposition of the testator's capacity. The contents of the will itself, coupled with the situation of the testator and the circumstances under which it was made, afford important evidence as to his capacity. (*Hall* v. *Warren,* 9 *Ves. jun.* 610.) And it seems that, from such evidence alone, where the terms of the supposed will are such as tend to exclude the supposition of the maker's sanity, the jury may decide against the validity of a will. (*Burr* v. *Daval,* 8 *Mod.* 59.) But it is clear, on the other hand, that it is not sufficient to show that the dispositions of the will are imprudent and unaccountable. (3 *Stark. Ev.* 1708.) No matter what the dispositions of the will may be—no matter how imprudent, unreasonable, or unaccountable they are—no *presumptions of law* can arise from them against the validity of the will, but mere natural presumptions from which a court or jury may draw the inference of the incapacity of the testator. In this case it is said that the dispositions of the will are not only imprudent, unnatural, and unreasonable, but that they are contradictory to the known intentions of the testator and to his repeated declarations regarding the final disposition of his property.

The nearest relative of testator living at his death was his brother, Garret Garrison, and all that was left him by the will is the wearing apparel, which is directed to be divided between him and testator's black man John, share and share alike. To one of the sons of Garret Garrison is given five hundred dollars, and to another son two hundred dollars. The bulk of the property is given to the Board family; three thousand dollars to Garret Hopper Van Horn, who married Mary Ellen Board, natural daughter of testator's wife before their intermarriage; five thousand to Peter G. Board, and other legacies to other members of the family. Eight hun-

dred dollars is left to Rebecca Garrison, a sister of his deceased wife, and two hundred dollars to Henry I. Speer, who drew his will; five hundred dollars he directed to be put at interest for the benefit of his black man John.

When the deceased married his wife she had a daughter, who was a natural child. Testator himself had no children by his wife. After their marriage, this daughter married John F. Board, and the descendants of this daughter are the principal legatees of the will. It is shown, by several witnesses, that the testator repeatedly declared that the Boards had received enough of his property, and that they should never get any more of it, if he had his senses. To overcome any presumption which might arise from these circumstances, it is shown that the deceased always manifested the greatest attachment and affection for his wife, and that it was the great grief caused by her death that occasioned his excessive intemperance, and the peculiarities which he exhibited manifesting any failure or aberration of mind. The attachment he always manifested for the Boards, notwithstanding his many peevish complaints against them, is also strongly relied upon. The daughter of Mrs. Garrison lived with a sister of her mother until that sister's death; the daughter was then thirteen or fourteen years of age. She then went to live with the testator, and lived with him until her marriage with John F. Board. Peter G. Board, her son, lived with testator until his wife's death. There was never any difficulty between the testator and any of the Board family, and his complaints about their not being attentive enough to him were always made in a peevish manner, and were not so much a manifestation of any hostility to them, as evidences of his mortification at their not reciprocating his attachment for them. What is said by Rebecca Garrison shows the true state of his feelings towards them. She says "the old man was glad when the Board family, or any of them, came there; when they did not come, he complained of it, and said they didn't care about him." His confidence in Garret Hopper Van Horn continued up to the time of his

death.  After the execution of the will, and about ten days before his death, when he had confidential business to transact, he sent for Van Horn, and sent him to Paterson to exchange the papers in reference to the sale of his farm, and to receive the money which was to be paid.  The remark he made to Mr. Goetchius, as late as May previous to his death, is calculated to mitigate the unfavorable impression of his declarations, that the Boards should not have any more of his property.  He said, to Mr. Goetchius, he had blood relations who appeared very friendly, but he knew what it was for, it was only for his property, but they wouldn't get much of it; he said that he had no children of his own, but that he had children he considered his own, and he would do well by them.  He alluded doubtless to the Boards as the children he had.

There is a circumstance mentioned by Rebecca Garrison, which shows clearly that the testator knew this will contained just what it in fact does, and that the testator, some days after its execution, remembered the fact well that it gave the principal part of his property to Van Horn and the Boards, and that the contents of the will were what he intended they should be.  In July, after he made his will, he sent for Peter Garrison, one of his nephews, a son of his brother Garret.  When Peter came, he told Rebecca Garrison to get some silver spoons he had in the house.  She says, "he raised up in bed, and took the spoons out of my hand, and said, here Peter, these spoons I'll give to you; and then he said he did not want his spoons he got from his father to go among strangers; so he said, if they went unto the Boards and Van Horns they would be sold for old silver; that what he got from his father should stay among the Garrisons."  Here was an intelligent recognition of the contents of the will.  The Boards and Van Horns could not get them except under the will he had made.  They were of no kin to him, and they could not possibly get the spoons or any other of his property but by will.

After giving this case the best consideration in my power,

my conclusion is, that the Orphans Court of the county of Bergen were right in making the order to admit the paper propounded as the last will and testament of Peter A. Garrison to probate.