EXECUTORS OF ELIZA MOORE, appellants, *and* ELIZA BLAU-
VELT, respondent.

15  367
46  517
15  367
47  241
47  259

What constitutes undue influence can never be precisely defined.   It must
necessarily depend in each case upon the means of coercion or influence
possessed by one party over the other.   Whatever destroys the *free agency*
of the testator constitutes undue influence.   It is immaterial whether that
object be effected by physical force or mental coercion, by threats which
occasion fear, or by importunity which the testator is too weak to resist,
or which extorts compliance in the hope of peace.

Threats of personal estrangement and non-intercourse, addressed by a child
to a dependent parent, or threats of litigation between the children to
influence a testamentary disposition of property by the parent, consti-
tute undue influence.

The fact that a testator has been induced to make a new will by false re-
presentations as to the contents of an existing will, is a proper element
in the consideration of the question of undue influence, although the
new will may not materially vary from the former one in respect to the
subject matter of the false representations.

Testimony on a question of undue influence, which is but matter of opinion,
is entitled to consideration only so far as it is sustained by facts.

*Bradley*, for appellant.

I. As to wills executed by blind persons, cited *Weir* v.
*Fitzgerald*, 2 *Bradf.* 68—71; *Blake* v. *Knight*, 3 *Curteis*
547; 1 *Jarman on Wills* 47–8 *(old edition)*; *Fincham* v.
*Edwards*, 3 *Curteis* 63; *Modern Prob. of Wills* 201—12;
*Longchamp* v. *Fisk*, 5 *Bos. & P.* 415.

II. As to testamentary capacity.

*Boylan* ads. *Meeker*, 4 *Dutcher* 277, (recognizing 4 *Wash.
C. C. R.* 267–8–9); *Den* v. *Vancleve*, 2 *South.* 670; *Harri-
son* v. *Rowan*, 3 *Wash.* 585—7; *Sloan* v. *Maxwell*, 2 *Green's
Ch.* 571, 581; *Whitenack* v. *Stryker*, 1 *Green's Ch.* 11, 12,
26–7; *Lowe* v. *Williamson*, *Ib.* 85–6; *Den* v. *Gibbons*, 2
*Zab.* 132, 155–6; 26 *Wendell* 265; *Modern Probate of Wills*
96, 112.

III. As to what constitutes undue influence.

1 *Jarman on Wills* 36–7; *Tunison* v. *Tunison*, 4 *Bradf.*
138; *Chandler* v. *Ferris*, 1 *Harring.* 454; *Lide* v. *Lide*, 2

*Brevard* 403; *Small* v. *Small,* 4 *Greenl.* 220; *Ise* v. *Bennett,* 1 *Coxe;* 4 *Wash.* 268–9; *Whitenack* v. *Stryker,* 1 *Green's Ch.* 267; *Lowe* v. *Williamson, Ib.* 86.

As to the opinions of witnesses.

*De Witt* v. *Barby,* 13 *Barb.* 550; *Culow* v. *Haslam,* 7 *Ib.* 314.

*Zabriskie,* for respondent.

As to what constitutes undue influence.

1 *Jarman* 37, 41; 1 *Williams on Ex'rs* 41—5.

THE ORDINARY. This case comes before the court upon an appeal from a decree of the Orphans Court of the county of Bergen, refusing to admit a paper writing to probate as the will of Eliza Moore.

The *factum* of the will is fully established. The instrument was executed and attested with all the formalities prescribed by the statute.

Nor is there any sufficient ground to question the testamentary capacity of the testatrix. There are, indeed, one or two witnesses, on the part of the caveator, who entertain a contrary opinion, and state circumstances tending strongly to corroborate that opinion. But the weight of evidence is very decidedly in favor of testamentary capacity. The evidence of the family physician of the testatrix, and of the pastor of the church of which she was a member, is clear and decisive. Upon this point I entertain no doubt.

The ground relied upon by the caveator is, that the will was procured by undue influence.

What constitutes undue influence can never be precisely defined. It must necessarily depend, in each case, upon the means of coercion or influence possessed by one party over the other; upon the power, authority, or control of the one, the age, the sex, the temper, the mental and physical condition, and the dependence of the other. Whatever destroys the *free agency* of the testator constitutes undue influence. Whether that object be effected by physical force or men-

Executors of Moore *v.* Blauvelt.

tal coercion, by threats which occasion fear, or by importunity, which the testator is too weak to resist, or which extorts compliance in the hope of peace, is immaterial. 1 *Jarman on Wills* 36–9–40; 1 *Williams on Ex'rs* 40, 45; *Kindeside* v. *Harrison,* 2 *Phill.* 449; (1 *Eng. Eccl. Rep.* 336); *Mynn* v. *Robinson,* 2 *Hag.* 169; *Small* v. *Small,* 4 *Greenl.* 223; *Davis* v. *Calvert,* 5 *Gill & Johns.* 302; *Martin* v. *Teague,* 2 *Spear's R.* 268.

In considering the question of undue influence, therefore, it becomes essential to ascertain, as far as practicable, the power of coercion upon the one hand, and the liability to its influence upon the other.

The testatrix, Eliza Moore, at the date of the will, had been nearly seventeen years a widow, her husband, Lewis Moore, having died in June, 1843. She had been the mother of thirteen children, of whom nine survived, and one of those deceased had left sons who were the objects of her bounty. Her children had all attained mature age. Three of them, a son and two daughters who remained unmarried, resided with her in the homestead at Hackensack. Her precise age does not appear by the evidence. None of her children speak of it. Her pastor, the Rev. Mr. Warner, thinks she was about seventy-five or seventy-six when she died. In this he was doubtless in error. Her son states that she was married in 1798, when she could have been, according to this estimate, but thirteen or fourteen years of age. It is safe to assume that at the date of the will she was about eighty years of age. She had been in the vigor of her days, as all the evidence shows, a woman of remarkable energy and decision of character. One of the witnesses describes her as a woman of strong, earnest, and decided will; another, who knew her well, says she was a woman of great energy, strong purpose, and clear foresight. She was very deliberate, a woman of good judgment, and when her judgment was once formed nothing could shake it. She was perfectly self-reliant, and not subject to be influenced by others. Another witness considered her a woman of firm mind, unusual deter-

mination of will, and not easily swerved from her own opinions. One of her children says of her—she was always firm and decided, and never gave way to either of her children before she lost her strength of mind.

At the date of the will her physical and mental powers had become impaired by age, disease, and care. She was totally blind. She required constant attendance and nursing. She was helpless, and confined almost entirely to her bed. She suffered from extreme nervous irritability, and was often in a state of high nervous excitement, resulting from family troubles. Within a year preceding the date of the will, she had been greatly shocked by the death of a daughter. Her physician testifies that " there were times when she would not have been capable of directing her attention to the matter of making a will. The whole powers of her mind would be overwhelmed, apparently, by the intensity of her suffering. The symptoms of her nervous morbid irritability exhibited themselves in a very remarkable degree. I gave her nervines and tonics, and for the rest depended upon kind nursing and freedom from excitement as much as practicable. Powerful and frequent anodynes were used, and she was kept to some extent under their influence. The highly morbid irritable state of the nerves under which she labored is very frequently the precursor of insanity, and it was to enable the brain to recuperate its energies and powers that I employed these remedies to prevent that unfortunate result. In the nervous condition in which the testatrix was, anything that excites the mind greatly makes it temporarily in a condition approaching insanity, and may very easily produce insanity. The morbidly sensitive nervous state in which the testatrix was about the time of making the will would materially diminish her powers of resisting urgent and continual importunities of those about her to change her will. To the question, whether the testatrix would certainly have yielded to any continued urgency by the united importunity of the children that were about her, he says, I cannot answer differently from what I did to the

last question. Her situation was peculiarly dependent, being blind and dependent upon her children around her. Whether she would positively resist, I cannot answer.

I deem this testimony of her physician especially worthy of notice, not only from the fact, that he had the best opportunities of forming a correct opinion, having been for a long period in close attendance upon the testatrix, but also from his high professional standing and intelligence, and because he is one of the executors who offer the will for probate, and can have no inducement, from feeling or otherwise, to give color to the case adverse to the validity of the will.

Many years previous to the date of the will, Doct. Blauvelt, a son-in-law of the testatrix, the husband of her daughter Eliza, the caveator in this cause, died leaving an infant daughter. Upon his death-bed the testatrix had promised him that she would treat his child as one of her own children. This promise she appears to have regarded as sacredly binding. She had at different times made her will, giving to this granddaughter a share of her estate as one of her own children. The last of these wills is an exhibit in the cause. It is dated on the eighth of September, 1854, and at the time of the execution of the will in question was in the hands of her counsel, by whom it was drawn, and who was appointed one of the executors. This arrangement in favor of the granddaughter was known to her children, and was regarded by several of them as partial and unjust. The testatrix had been urged by them to alter it, but she had steadfastly refused, and had declared that while she retained her senses it should never be done. Four of the children are represented to have been particularly dissatisfied with the arrangement, and desirous to have it altered, *viz.* John, Louisa, wife of —— Fair, Charles, and Mary, the two latter residing with their mother. They remonstrated with the mother against her giving to the grandchild, as well as to its mother, who was still living, the share of a child. This state of things in the family was no secret, but seems to have been well known in the neighborhood. It is spoken of by the Rev.

Mr. Warner and several other of the witnesses. It continued for several years, and until after the return of Mrs. Fair, one of the daughters of the testatrix, from Europe. She was absent two years, and returned in May, 1858. Her sister Mary fixes the date of Mrs. Fair's return in May, 1859. But this is obviously a mistake, for the will was executed in February, 1859, when, as all the witnesses agree, she was present, and had been at her mother's the previous summer. The facts which have been stated touching the condition and circumstances of the testatrix and her family are clearly established by the evidence. Nor do they seem to be at all controverted. It is important that they should be borne in mind in estimating the force of the circumstances connected with the execution of the will and the weight of the testimony where the witnesses are in conflict.

Louisa Moore, a daughter of the testatrix, who left home a few days before the execution of the will, gives this account of some of the circumstances preceding its execution : " The opposition of the children, opposed to the will as it had been executed, was manifested by their arguing and reasoning with ma, and trying to convince her that what she had done was wrong. The influences were more especially exerted upon her mind for the last two years. She was talked to frequently, sometimes for an hour or two at a time. There was a great deal of trouble about the will, and they told ma that they wished her to write a codicil, because, they said, she had left Eliza Zabriskie what she had no right to leave her, and that was a share in the homestead, and then they said she must alter that. I left home on account of the trouble about the will, and I left her very much distressed, and as I thought completely under the control of those who were dissatisfied with the will. From what I saw of my mother, and of the influences that were brought to bear upon her, she would not have made this will if left to herself. She was not in a fit state of mind to resist the influences they brought against her to have her make this will. From

all that I saw and heard, the making of the new will was brought about by excessive persuasion, importunity, and threats."

Much of this testimony is but matter of opinion, and is entitled to consideration only so far as it is sustained by facts.

Alice H. Kelk, after stating the disposition which the testatrix informed her she had made of her property under the old will, testifies: I believe Mr. John, Miss Mary, Mrs. Fair, and Mr. Charles first suggested to her a change in that will, or the making a new one. First, she was requested to add a codicil to the will, and the doctor and minister being asked as to her capability to do it, when they said they thought she was capable, then her children told her, if she was able to prepare a codicil she was able to write a will. This might have been a few weeks or a few days before the making of the new will. When Mrs. Fair had come up to see her, after being in New York, Miss Mary told her that John was coming up the next day. She then asked Mrs. Fair what John was coming for. Mrs. Fair answered, he was coming on business, saying you have got to make a just will, and you have no right to leave a dollar to any but your children. The next day Mr. John came up, and it was talked over and arranged to have it done the next day. In the morning, the person she wished to have to make the will was away. Then she took hold of that as an excuse for not doing anything then. After that Mr. John Moore came up to her, and bid her good-bye, saying he should not see her again, or words to that effect. Then Mr. Charles took hold of the subject, saying she had done it now, that it would be worse than ever—the affair or the property would be worse than ever. Finally she seemed to think that it would be best to do the thing. The whole of this was under this excitement, and she consented to do it. Then another gentleman was fixed upon to draw the will. After it was done, she was constantly uneasy, and several times requested to have it destroyed. Finally she sent for Mr. Zabriskie, and I suppose said a dozen times each way, "destroy it," and "don't de-

stroy it." Mr. Simeon Zabriskie, Charles Moore, and myself were present. She was so bewildered that I said to her, Mrs. Moore you are not in a fit state now; let it be until you can think of it. This was the day before she had a paralytic stroke. After that, the doctor ordered that she should be kept perfectly quiet, and not conversed with at all. The precise time that elapsed between the execution of the will and the stroke of paralysis is not clearly ascertained. Three of the witnesses speak of it as being but a few days. Two others, Miss Louisa Moore and Doct. Hasbrouck, speak of it as being weeks. None of them pretends to fix the time with precision. It was probably not less than two weeks. During this period, it is clearly shown that her mind vibrated between approval and condemnation of the act that she had done. The material fact to be noted is, that during this interval she did not rest satisfied. She was constantly uneasy, and the very day before she was stricken with paralysis she sent for the scrivener, and requested the will to be destroyed.

The credibility of these two material witnesses, the nurse and the daughter, are not seriously impeached. It is said, indeed, that the one is a partizan or friend of the caveator, and the other is not of very strong mind, but nothing is suggested unfavorable to their character for veracity. Let us see, then, how far their testimony is incidentally sustained by admitted facts or by the direct testimony of other witnesses. It is clearly proved, as stated by Miss Louisa Moore, that she was absent from home at the time the will was executed. Charles and Mary were at home. The will was executed on Friday, the fourth of February. On Thursday, the day previous, John arrived from New York. Mrs. Fair came on Wednesday. On the day of the execution of the will, and on the day previous, John, Charles, Mrs. Fair, and Mary were in the house with their mother alone. No other member of the family was present, and no one else but the nurse, whose testimony we have. On the afternoon of Thursday, the contents of that will and who should be the executors were discussed and settled. In the language of

John, "the whole ground was gone over." What passed at that discussion we are left in great measure to conjecture. We know that the contents of the will were moulded to satisfy the views and wishes of those children of the testatrix who were dissatisfied with the existing will. It would naturally have been supposed that the testatrix, if this change of will had been hers, would have had recourse to her counsel, by whom the former will had been drawn; who had been appointed one of her executors, and to whose custody for safe keeping the will had been intrusted. But this was carefully avoided. It was originally proposed to add a codicil to the existing will. This was the idea of the testatrix a few days before the will was executed, and she then seemed to have no idea of changing her executors. She consulted one of them, and stated that her only object was to alter a provision which she had been led to believe was in the existing will, but which in point of fact was not there. The purpose of making a new will and of changing the executors was adopted very shortly before the will was executed. We learn from the lips of Doct. Hasbrouck, at whose instance it was done, and the motive that led to it. To the question, did John L. Moore, or any one else, consult you about being an executor before Mrs. Moore herself spoke to you—he answers, "Mr. John L. Moore and Charles Moore, if I am not mistaken, stated it would be agreeable if I would be an executor; Charles said it was the wish of the family (not of the *testatrix,* but of the family,) that the estate should be in the hands of an honest man, and out of the hands of the lawyers. He said he had no doubt they would make out of it what they called a beautiful case. I declined the position both to John and Charles." Knowing the character of the legal gentlemen who had been appointed executors of the existing will, it is easy to understand the *animus* of this whole transaction. The executors of the new will were selected and spoken to by the sons. They both called on Doct. Hasbrouck before the subject was mentioned to him by the testatrix, although he was her family physician and saw her frequently.

The scrivener was selected in the same way. John went for one counsel, who it had been agreed should write the will, and who was absent. He called of his own accord upon another, who was engaged, and then went for the scrivener who had been selected as one of the executors. Mr. Simeon Zabriskie, the scrivener, was an old neighbor and acquaintance of the testatrix. He had never been advised by the testatrix of her purpose to make him an executor. He says that John L. Moore came for him. "He told me how the will was to be drawn; told me all the provisions of the new will, as Mrs. Moore afterwards stated them to me; told me that she had made a will before, but was not satisfied with it; she wished me to come and draw another will, and wanted me and Dr. Hasbrouck to be executors. I thought this was rather strange that he should call *on me* to draw the will. I told him I would go to Mrs. Moore's probably the next day, not immediately, and hear what *she* had to say about it." It is certainly a remarkable and significant fact, that the family physician not only refuses to act as executor upon the request of the sons, but an old neighbor and friend declines to act at all at the request of the son, though he professes to come in the mother's name, but replies he will come the next day, and hear what she had to say about it. The witness adds— "Mr. Moore told me she wanted it done that afternoon, so I went with him to the house." So far from her desiring it to be done that day, Miss Kelk testifies that "she took hold of the fact, that the person whom she wished to write the will was absent, as an excuse not to do anything then, but finally, after strong influences used to operate upon her, she consented." The whole active management of the matter was obviously in the hands of the sons, not of the testatrix. She appears to have been passive in their hands. All the evidence in the cause shows that the mother did not desire to change the old will in favor of her granddaughter. She was not dissatisfied. It was her children who were dissatisfied and who urged the change—all the evidence shows this; it is denied by no one. John Moore and Mary Moore, the two

most material witnesses for the will, and who were parties to it, confirm the statement. But they allege that the mother acquiesced in the views of her children, and approved the change.

The only question is, whether that change of views was induced by undue influence? Was it induced by persistent importunity, which she was too weak to resist? Was she harassed into submission by excessive importunity? Was it assented to for the sake of peace?

We have, at the outset of this inquiry, not only the direct testimony of two witnesses, but the significant fact, that although this importunity had continued for years, while the testatrix retained her health and vigor of mind, she successfully and utterly refused to yield to the importunity or to alter her will. The importunity was successful only when the powers of her mind and body had been weakened by age and infirmity, when she was bed-ridden, blind, racked by disease, and utterly dependent upon her children. We have the further significant fact, that after the new will was executed, the testatrix was dissatisfied, and sought to destroy it. Doct. Hasbrouck testifies, that on the seventh of February, three days after its execution, she spoke to him of destroying the will. He does not give us her language in full, but it is manifest, from his reply, that she was dissatisfied with the will. "I said to her," is his testimony, "as your property, Mrs. Moore, is your own, you have a perfect right to do with it as you please; and if you have not made such a will as you think you ought to make, all you have to do is to destroy it." The witness inferred, from the reply of the testatrix to this statement, that she was not dissatisfied. Her reply was, "as to that, doctor, I don't think I can better it." The language is certainly equivocal, and admits of two very different interpretations. The testatrix has put her own interpretation upon her language, for within a day or two afterwards she acted upon the doctor's suggestion—sent to the scrivener, and requested him to destroy the will. We have the scrivener's account of this transaction, and of the

mode in which the purpose of the testatrix was defeated. " The testatrix sent for me to destroy the will, not more than a day or two after it was executed." In the time of the transaction the witness is mistaken, for he subsequently states that he is sure this occurred after he went to Jersey City, as the bearer of a note, written by Doct. Hasbrouck, at the request of the testatrix, to Mr. Zabriskie, requesting him to return the old will. This note is in evidence. It is dated on Monday, the seventh of February, three days after the date of the will, and on the day of the interview already spoken of between the doctor and the testatrix. On Tuesday, the witness went to Jersey City, and returned the same evening. It was probably on Wednesday or Thursday, nearly a week after the new will was executed, that the scrivener was sent for to destroy the will. The witness states—" I went to her house; she told me to go home, and destroy that will. I went home with the intention of destroying it according to my orders, but on my way home the thought struck me that I would not destroy it that evening, but take the will next morning and hand it to Mrs. Moore herself, and let her do what she thought proper. Charles Moore came to my house, and asked me whether I had destroyed the will. I told him I had not. He then told me his mother had said I must keep it, and let it remain where it was." Whether the mother ever gave such order to Charles does not appear. It would seem that she did not. The reason assigned by the scrivener to the testatrix for not destroying the will was, that he thought it best to bring it to her; for if he destroyed it, who would know he had destroyed it. The witness adds, " a few days after that I was in the room with the testatrix, Miss Mary, Charles, and the nurse, Miss Kirk. Mrs. Moore then told me again I should go and destroy that will. A few moments after, she told me I should not. After a few minutes, she told me again to destroy it. So then I made a move about going off. She then told me to leave it for the present. I think that was the last time I ever saw Mrs. Moore alive. She was shortly after taken very sick with·

paralysis, or something like it." The witness, on a further cross-examination, accounts for this extraordinary vacillation on the part of the testatrix. He says, " Charles spoke to his mother, to induce her not to destroy the will. He said she did very wrong to destroy it. It was wicked in her to have it done. There was a good deal said about the bed, but I don't recollect particularly. His language was loud and boisterous. I thought his language very severe to a mother. In my opinion, if Charles had not interfered in the manner he did, she would have destroyed the will.", This is the same interview spoken of by the nurse, Miss Kelk. She says, respecting it, after describing the conduct of the testatrix—" I had to support and restrain her. Finally, I begged her to leave it at this time until she was able to think, for she was then quite unable. Charles was present at this time, and intimidated her by violent language, telling her she never had done justice to her children, and he wondered she was not afraid God would take away her speech. This was the day previous to the stroke of paralysis. This was the last time the subject of the will was referred to by the testatrix or in her presence. She was forbidden to speak about the will after the stroke of paralysis. The children were all told, and the doctor said the subject of the will must not be mentioned to her."

False representations were also made to the testatrix of the contents of the former will, in order to induce her to make the new one. The title to the homestead lot, upon which the testatrix resided, she had derived from her father, Michael Price. She believed that she had title to those premises for life only, and that on her death they belonged to her children. It would seem, from the evidence, that she had been advised by her counsel that she had a legal title to those premises in fee. Nevertheless, by her will, she directed that her daughters might remain in possession of the homestead for one year only after her death, and that it should then descend to her heirs-at-law, as if she had died intestate. Representations were made to the testatrix, that by this will

she had given to the granddaughter a share in the homestead with her other children.   Mary Moore testifies that her mother was given to understand, by Mrs. Fair and John, that she had willed a share in the homestead to her granddaughter.   This the witness states was one of the first things that caused dissatisfaction in the testatrix with the then existing will.   She was ready and willing to make a different appropriation of her property.   She saw decidedly the injustice of that will, in leaving her granddaughter an equal share of the homestead.   The testatrix said that was not her intention, and her impression was that she had not done so. But she derived from her children the impression that it was otherwise, and consulted Mr. Banta, one of her executors, upon the subject.   He said it was not so.   Mr. Banta testifies " that the testatrix sent for him, about a week before the making of the will, and spoke of the change she wanted made.   She said they told her she had given her granddaughter Eliza an interest in the homestead equal to her children.   The witness repeatedly assured her the fact was not so.   She seemed to think she had made such a disposition of the homestead.   She said they told her so, and almost insisted upon it, but afterwards seemed to be convinced of what was said, and was perfectly satisfied with the old will." The testatrix, it is manifest, was thus persuaded that the existing will was unjust, and was thus induced to make a new one.   The force of this objection, though qualified, is not destroyed by the consideration that this influence was used, not to induce any particular disposition of the property, but simply to induce the making of a new will; that in this respect the new will is not materially different from the old one, and therefore no one was prejudiced by it.   A will was in existence with which the testatrix, down to the time of making the new will, had professed herself to be perfectly satisfied, and which for years she had resisted all the importunities of her children to alter.   The fact of her consenting to make a new will raises a presumption that her mind had undergone a change in regard to the provisions

of the old one, and if no other material change was made, it might raise a fair presumption that her views had changed, as it is alleged they had done in regard to the provision in favor of the caveator, the change in which constitutes the subject of complaint. The fact, moreover, that the testatrix was induced by false representations to act at all in the premises, is a proper element in the consideration of the question of undue influence.

The material circumstances relating to the procurement and execution of the will are, that the children, not the testatrix, were dissatisfied with the old will; that its contents were well known to the family, had long been the subject of complaint upon their part, and of urgent entreaty that an alteration should be made; that as long as the testatrix was in health this was resisted; it was yielded to only when the testatrix was enfeebled in mind and body by age and disease; that the children were the active agents in the procurement of the will. They met at the house of the testatrix for the purpose of having it executed without the previous request or knowledge of the testatrix; they made application to the persons intended to act as executors, and called in the scrivener, summoned the witnesses, gave directions to the scrivener for the preparation of the entire will before he had seen the testatrix; were present when the instructions were received by the scrivener from the testatrix, took an active part in giving those instructions, (so much so as to prompt the suggestion, by one of the sisters to the scrivener, that it was the will of her *mother*, not of her *brothers*, that he was preparing); importuned the testatrix not to revoke the will after it was executed—interfered to prevent the scrivener from destroying it, in compliance with the instructions of the testatrix—were present when the testatrix ordered the scrivener to destroy it, and by intimidation prevented her from having the order carried into execution. A total absence of all evidence that the testatrix ever before, or at, or after the execution of the new will in the absence of the children, by whose influence the will was

procured to be executed, ever expressed her dissatisfaction with the old will, or her approbation of the new one; or that she ever ceased, down to the hour that she was struck with paralysis, and all further conversation on the subject was forbidden, to declare that she was satisfied with the original will, and to urge that the new one should be destroyed. The circumstances under which the act was accomplished, the mode of effecting it, and the events that succeeded, are so indicative of undue influence on the part of the children that, in the absence of all direct testimony, it could hardly fail to be regarded as the result, not of free agency, but of undue influence or coercion.

There is evidence, also, that the testatrix was threatened, as well as importuned to alter her will. Her fears were directly appealed to, fears not of personal violence, but of family discord and litigation among her children. Louisa Moore testifies, that after her mother was taken sick, those that influenced her threatened her to put all the property in law, if she did not do as they told her, and they told her the world said it was an unjust will. Again she says, I heard them threaten her to put all her property in law if she did not alter her will. I heard Mrs. Fair say that it would all be put in law if she did not alter her will, and I heard Charles tell her so too. To see the full force of this evidence, and the probable effect of these threats upon the mind of the testatrix, it is necessary to revert to the testimony of John L. Moore. He testifies, that after his father's death there were law suits between him and one of his brothers respecting the father's estate. It was against the views of the mother, and she sent him word that if the suits were not stopped she would disinherit him. He believes she did disinherit him at one time, but he was afterwards reinstated in her will the same as the other children. In consequence of these difficulties, upon more than one occasion, the mother and son were not upon speaking terms. For years the son did not enter his mother's house or speak to her. How many years this continued the son does not state. But

when he first heard she was entirely blind, then he went to see her, and all coldness after that ceased. There was no formal reconciliation or explanation made; he went in and shook hands, and that was an end of the affair. This evidence shows that there had been years of estrangement between this son and his mother, growing out of litigation in the family. It enables us to appreciate the force of the evidence given by Miss Kelk, in depicting the scene between the mother and her sons, when she was finally induced to consent to an alteration of her will. After stating that the mother, on the day that the will was proposed to be executed, laid hold of the absence of the person who she wished to write the will, as an excuse not to do anything then—she says, "after that Mr. John Moore came up to his mother, and bid her good-bye, saying he should not see her again." This act, simple as it seems, must have brought back to that aged and infirm parent's heart and memory the sense and recollection of those bitter years of alienation between herself and her son. Its language was, that will must be executed to-day as I wish it, or you and I part. So it was understood by Charles, the accomplice in this wrong; for he immediately took hold of the subject by saying, you have done it now, it will be worse than ever. This language is addressed by two sons to an aged, helpless, blind, and dependent mother, to induce her to execute a will in compliance with their wishes. If that is not undue influence, what is? Would threats of personal violence be more calculated to excite fear or apprehension from a parent, or to extort an unwilling compliance with the views of her children? Would any form of coercion be better calculated to deprive her of her free will? We know that in this case it accomplished what years of argument and persuasion had failed to effect. Threats of personal estrangement and non-intercourse addressed by a child to a dependent parent, or threats of litigation between the children to influence a testamentary disposition of property by the parent, constitute undue influence.

The standard of testamentary capacity has been properly
fixed at a very low point in the scale of intelligence. The
right of a testator, however feeble his powers of mind or
body, to the control of his property by testamentary dispo-
sition, so long as he has intelligence to exert it, has been, by
the courts of this state at least, inflexibly maintained. It
is right that it should be so. But it behooves a tribunal of
justice, while maintaining, upon the one hand, the right of
the testator to that unlimited dominion which the law gives
him over his property, to resist, upon the other, with watch-
ful jealousy all attempts to interfere with the free and un-
trammeled exercise of that dominion, and to see that, in the
testator's hour of weakness and infirmity, the will of another
is not substituted for his own.

The evidence satisfactorily establishes the fact, that the
writing offered for probate was procured from the testatrix
by undue influence, and is not her last will and testament.

The decree of the Orphans Court must be affirmed with
costs.