JAMES H. McCOON, appellant,

v.

ROBERT ALLEN, JR., respondent.

1. A test of testamentary capacity is whether, at the execution of a will,. the testator can remember the property he is about to dispose of and the objects of his bounty, and can understand the nature of the business in which. he is engaged and the manner in which the will distributes his property.

2. The presumption of the law is in favor of capacity.

3. Every influence is not undue. Suggestion and even persuasion may be safely used with a testator, if they do not destroy free agency, and amount to. moral or physical coercion. No rule can be laid down to define the limit of legitimate influence. Each case must depend upon, and be determined by, the circumstances and conditions which surround it.

On appeal from Monmouth county orphans court.

*Mr. Joseph F. Randolph,* for the appellant.

*Mr. Robert Allen, Jr.,* and *Mr. E. W. Arrowsmith,* for the respondent.

THE ORDINARY.

This appeal is from a decree of the orphans court of Monmouth county, which admits to probate, as the last will and testament of William McCoon, two papers, one bearing date on the 13th of February, 1869, purporting to be the will of William McCoon, and the other, bearing date on the 15th day of October, in the same year, purporting to be a codicil to that will. Both papers appear to have been executed in compliance with the requirements of the statute. Their admission to probate as William McCoon's will is contested upon the grounds that McCoon lacked testamentary capacity, and, if that position should not be tenable under the proofs, that he was so unduly influenced to make the papers that they fail to express his will, but express the will of others.

At the time the papers were executed the testator was about fifty years old. After their execution he lived eighteen years, dying in December, 1887. He never married. For the forty-six years immediately preceding his death he resided with his cousin, John Trafford; from 1841 to 1857 in Trafford's father's house, and after 1857 in Trafford's own house. He and Trafford were nearly the same age. Their mothers were sisters. In 1848, upon the settlement of his father's estate, he became entitled to securities consisting of bonds and stocks valued at nearly $28,000, but suffered them to remain in the hands of his brother Cornelius, who had settled his father's estate, without making any attempt to take possession or control of them. He was then regarded in his family as feeble in mind and incapable of managing his business matters. The widow of Cornelius McCoon says that he acted like a boy, could understand what he was told, but could not take care of his own affairs, and that her husband had attempted, by taking him into his store at one time, to teach him something about business, but failed to make him understand anything about it. William H. Townsend, a brother-in-law, who is named as one of the executors in the disputed will, and whose interest is naturally with the respondent, also says that William McCoon was not competent to manage his affairs as they should be managed.

In 1863, some five years after he became entitled to the property in question, he transferred it to his brother Cornelius, his brother-in-law, William H. Townsend, and one Benjamin G. Sherman, in trust, to manage it, collect the income from time to time, paying so much of it to him as his necessities might require, accumulate the remainder, and, at his death, distribute the property, with its accumulations, among his next of kin, according to the statute of distributions in the State of New York. The making of this deed, and the tenor of its recitals and provisions, notwithstanding the words that are employed in the instrument, are urged as evidence that, at the time when the deed was made, William McCoon was in a helpless and dependent condition. The deed recites that it was then "irksome and inconvenient" for him to bestow proper care in the management of his affairs,

and makes provision for a time when "from sickness or other
cause" he may become "enfeebled or disabled in body or person
so as to require attendance and care of his person," and for his
protection from "casualties, accidents, events and occurrences
incident to life, that may tend to impair or produce imbecility of
mind," and from "the craft, control and influence of others."
It is urged that it was an instrument, executed by a man in the
prime of life, when he should be in the enjoyment of his greatest
mental strength, for the purpose of irrevocably surrendering the
control and disposition of his entire estate, and making provision
against an apprehended future, physical and mental impairment,
and that, consequently, it cannot be looked upon, taking it in a
light most favorable to its support, as less than a confession, by
all the parties to it, of the grantor's deficiency and weakness.
After this deed was executed, Cornelius McCoon continued to
manage the estate thus put in trust until 1865, when, because of
his ill-health, he transferred the management of it to his co-
trustee and brother-in-law, William H. Townsend, who retained
the trust property in his custody until William McCoon's death.

In 1868, Phœbe and Amelia McCoon, two maiden sisters of
William, died. From their estates he became entitled to a little
more than $15,500. The securities in which these moneys were
invested were transferred to William H. Townsend, as the
attorney of William McCoon, in January and March, 1869. On
the 13th of February in that year, the paper in contest, purport-
ing to be the will, was executed. By that document, Rachel, the
wife of John Trafford, and Edwin F. and Frank W. Town-
send, the sons of William H. Townsend, are each bequeathed
$5,000, and Margaret Trafford, the daughter of John Trafford,
is bequeathed $500, out of the moneys received by the testator
from the estates of his sisters Phœbe and Amelia. By the same
instrument, the testator's furniture is given to Rachel Trafford;
his horse, wagon and harness to John Trafford, and his gold
watch to Margaret Trafford; and Rachel Trafford and the testa-
tor's nephews, Edwin S. and Frank W. Townsend, are made the
residuary legatees and devisees, and William H. Townsend,
Edwin S. Townsend and Robert Allen, Jr., are appointed the

executors of the will.   On the 15th of October, in the same year, the paper, purporting to be a codicil to this will, was executed.   That document provides that if Edwin S. and Frank W. Townsend, or either of them, should die before William McCoon, his or their share in the residuary estate shall go to William H. Townsend and Elizabeth his wife; and that if Rachel Trafford should die before William McCoon, her share of the residue shall go to her husband and daughter.   When the will and codicil were made, the next of kin of the testator were his brother Cornelius, his sister Mary Ann McCoon, and his sister Elizabeth, wife of William H. Townsend.   Thereafter, in 1884, Cornelius McCoon died, leaving three children, James, who is the appellant in this suit, Anna and Caroline; and Elizabeth Townsend died, leaving two sons, Edwin S. and Frank W., above mentioned.

By a writing, dated the day before the codicil to the will was made, William McCoon receipted to William H. Townsend for the $15,500 in his hands, and a few days thereafter Townsend paid that sum to some one (whether it was to William McCoon or to some other person does not appear), who divided it between Rachel and Margaret Trafford and the sons of William H. Townsend, in the same proportions in which the will bequeathed it to them.

It is insisted that the Traffords and Townsends, in concerted action and with the assistance of Robert Allen, Jr., who was a cousin and the attorney of John Trafford, first procured the will to be made in their favor, and then the codicil, and, at the time the codicil was made, procured the division of the $15,500 among them, controlling William McCoon, and bending whatever will he had to their purpose, and that they then commenced, in the name of William McCoon, to question the trust deed, with a view to have the residuary clause of the will ultimately determine the disposition of the trust funds.   It is claimed that the principal actors in these proceedings were Elizabeth Townsend and Rachel Trafford, both of whom are dead, and Robert Allen, Jr., the respondent, and that with difficulty those persons induced William H. Townsend, who had custody of the $15,500, to

acquiesce in their scheme. But little evidence can be had in support of this insistment, and that which is had is purely circumstantial. That the will and codicil were made in favor of the Townsends and Traffords, and that the $15,500 was divided among them, is clearly established, but as to the exact connection of William McCoon with that transaction the evidence is meagre and unsatisfactory. As to his connection with the division of the money the evidence is as follows: William H. Townsend produced William McCoon's receipt for the $15,500, and testified that he could not tell anything about the transaction to which it refers, except that the amount receipted for was paid. Edwin S. Townsend testified that he remembered nothing about the division, except that he received some money amounting, according to his impression, to about $5,000, and that he was not present when the division was made. John Trafford said that he remembered merely the fact that the money was divided as indicated some time in the Fall of 1869. And Robert Allen, Jr., swore that he had no recollection of the distribution having been made through him; that his impression was that it was made by the parties concerned in it, and that he did not remember that he consulted with Rachel Trafford or conversed with William McCoon about it. The proof, beyond the division itself, and this lack of memory upon the part of those who were concerned in it, which chiefly throws suspicion upon the transaction, is that which appears in two letters from Robert Allen, Jr., to William H. Townsend. The first of these letters is dated at Red Bank, on October 21st, 1869, at eleven P. M. In it Mr. Allen wrote that it would not be necessary that William McCoon's receipt for the $15,500, which had been sent to Mr. Townsend, should be acknowledged or recorded, as it had been witnessed by a representative person of Red Bank. This letter was addressed to Mr. Townsend at his residence in New York city, in the care of Rachel Trafford. The second letter was written at five o'clock in the morning of October 22d, six hours later than the letter just referred to. By that letter Mr. Allen told Mr. Townsend that he had advised Rachel to see him, Townsend, personally, because at a personal interview she and

Townsend could better "understand each other's views." He added :

"I do not think and cannot see that you should have the receipts you speak of. On the other hand, the existence of such receipts, I am of opinion, might eventually be detrimental, and might, in all probability, be the source of difficulty, and could easily be used by other parties as evidence of a want of confidence on your part, and on the part of others, as to the propriety of the transaction of the business, or to weaken other papers. As you have a receipt signed by William, and the same shows a plain, simple transaction between you and him to the amount expressed in that receipt, under seal, you have, when you pay over to William the amount of that receipt, sufficient protection in that receipt which your wife took ; a good and sufficient bar, in my opinion, against any claim William might make after the payment of the money in the receipt, and I firmly believe that that receipt will amply protect you to the extent of its amount after it is actually paid to William."

The letter also assured Mr. Townsend that William McCoon might dispose of his property as he pleased, and that Townsend need not feel that he ran any risk or had any responsibility with that disposition. The insistment is, that these letters show that Mrs. Townsend procured her brother to sign a receipt for the $15,500 in her husband's hands; that the receipt was sent to William H. Townsend and that he, knowing the helpless condition of William McCoon, was unwilling to accept the receipt without a formal acknowledgment of it by William, so that it might be recorded, or to pay the money unless those among whom it should be divided should also receipt to him for it; that Mr. Allen wrote to persuade him that the unacknowledged receipt of William McCoon alone would afford him ample protection after the money should be paid, while the exaction of a more formally executed paper from William McCoon, and additional receipts from others, would indicate a consciousness of the impropriety of the transaction and throw doubt upon the validity of the will and its codicil, and that, at the same time, Allen sent Rachel Trafford to Mr. Townsend that she might personally second the arguments that he, Allen, thus advanced. It is at least evident, from these letters, that Mrs. Trafford and Mrs. Townsend and Mr. Allen were anxious that the $15,500 should be paid upon the receipt of William McCoon, knowing

that some disposition was to be made of it that would probably be questioned, and conscious that the capacity of William Mc-Coon was at least not assured. It is impossible to regard this anxiety and knowledge, together with William McCoon's condition, and the fact that he was surrounded by the Traffords and Townsends, and that the money was distributed immediately after it left the hands of William H. Townsend, without suspicion at least that the distribution was the work of an undue influence. The fact that this distribution of one-third of this entire estate was made under the circumstances stated, bears upon the inquiry here, both as to capacity and undue influence.

But the proofs do not stop here. After the distribution of the $15,500 Mr. Allen wrote, as the attorney of William McCoon, to Cornelius McCoon, demanding from Cornelius an account of such moneys and property of William as might be in his possession, and particularly, an account of William's interest in the estates of his deceased sisters, Amelia and Phœbe. It is insisted that, as the moneys from the estates of Amelia and Phœbe had just been divided, after having been receipted for in full, this letter was designed to secrete that transaction. Shortly after it was written the appellant called upon Mr. Allen to understand what he meant by his letter, and was referred by Allen to William McCoon. He states that he then called upon William McCoon, who was weak, very hard of hearing and quite unable to converse upon the subject, and that McCoon declined to discuss the matter with him, saying that he was doing as he was told. The appellant then, after consultation with Benjamin B. Sherman and his lawyers, demanded from William H. Townsend an account of William McCoon's moneys, to which demand Mr. Townsend answered in effect that on March 1st, 1870, William McCoon's trust fund amounted to $39,005.54, and that the fund from the estates of Amelia and Phœbe amounted to $16,034.41, although, at that time, as has been seen, the latter fund had passed from his hands and had been distributed to his own sons and to Mrs. Trafford and her daughter.

On the 4th of February, 1870, Mr. Allen wrote to Mr. Sherman that the trust deed had some time since been declared void

by William McCoon, and that Cornelius McCoon and William H. Townsend had been notified to that effect, and a letter, without date, from William McCoon to his brother Cornelius upon the same subject has been put in evidence. This letter is as follows :

"DEAR BROTHER—Can the trust deed be annulled? If it can, I should like to have done, and also draw on the ———. When I want money, to draw on the trust deed, as I wish to save the others to my heirs.
"Your brother,                                      WM. McCOON."

Whatever the object of these letters may have been, it is insisted that they exhibit the influence of Mr. Allen over William McCoon, and McCoon's weakness, and mark some further design with reference to the trust fund. This completes the testimony of the appellant. It does not deal directly with the will and codicil, but treats of collateral transactions which bear upon the testator's mental capacity, and exhibit the character of those by whom he was surrounded and to whom he gave his property.

The questions to be here determined are, whether the testator possessed testamentary capacity, and, if he did, whether he was so controlled by others that he acted contrary to his own will and did that which, if he had been left to himself, he would not have done.

Enough has been shown to call for a guarded and close scrutiny of the circumstances and testimony which bear directly upon the making and execution of the will and codicil, and the condition of the testator at the time when they were made and executed.

The only living witness to the will is Thaddeus Wilson, a clergyman at Shrewsbury, and he speaks from recollection, twenty years after the transaction. He says that the will was executed in William McCoon's bed-room, at the house of John Trafford, at Shrewsbury. He remembers that then McCoon had had hemorrhages, and was in bed, feeble and sick, but sitting up. He does not remember whether McCoon conversed at the time. He remembers that Mr. Allen superintended the execution of the paper, and that Mrs. Trafford and Doctor Conover, and the other two witnesses to the will (all of whom are now

dead) were in the room.   The witness thinks that the will was
not read, but that the attestation clause to it was read.   His
belief is that the testator was then competent to attend to busi-
ness.   He says that he appeared to have his usual intelligence,
and did not exhibit any peculiarity in either appearance or con-
versation.   The witness saw nothing of Mrs. Townsend upon
that occasion.

Robert Allen, Jr., says that he was called from Red Bank to
Shrewsbury to draw William McCoon's will.   He thinks that
John Trafford came for him.   He remembers that he took Mc-
Coon's instructions for the will, but cannot remember whether
he drew the will at Trafford's house or at his own office.   He
states that he does not remember of ever having discussed the
making of McCoon's will before that day, either with McCoon or
with any other person.   He remembers that the testator was sick
in his bed-room, but cannot recall whether he was in bed.   He
does not remember the formalities of the execution, but relies
upon the attestation clause and his habit of seeing that that
which it recites actually happens.

John Trafford remembers the fact that a will was made in
February, 1869, and states that he never talked with the testa-
tor about making it, and had no knowledge as to its contents
before it was executed.

These are the only witnesses who speak about the execution
of the will.

The proponent examined several neighbors and acquaintances
as to William McCoon's mental capacity.   Theodore Sickles,
a grocer, who was formerly a partner of John Trafford, says
that William McCoon frequently came to his store and talked
with him, and made purchases, in such a way that the witness
was impressed that he was capable of managing and transacting
his ordinary business affairs.   Henry Child was a clerk in a
store at which McCoon frequently dealt.   He says that McCoon
selected the articles which he desired to purchase, and always
paid cash for them, and that he seemed to be of sound and dis-
posing mind, but that he had some difficulty in hearing.   From
William Smock, McCoon purchased harness at times for a period

McCoon *v*. Allen.

of twenty years.  Mr. Smock was impressed that he could manage his ordinary business affairs, although it was difficult at times to make him hear.  John Eyles made three carriages for him.  McCoon alone contracted for them.  Eyles thinks that he was capable of managing his ordinary business affairs.

A letter from William McCoon to Edwin S. Townsend was offered in evidence by the proponent.  It is dated at Shrewsbury, on the 23d of November, 1869, a month after the execution of the codicil, and shortly after the division of the $15,500, and is as follows :

"DEAR NEPHEW—You are welcome to the liberal gift you received from me and I hope you will make good use of it, and also tell your mother and father that they are welcome to the gift to Frank.  Don't hurry yourself about the saddle.  Get it when you have time.  I am quite smart now so that I can go out riding every day when it is clear.  Give my love to all.
"From your affectionate uncle,
"WM. McCOON."

The codicil to the will was executed at Red Bank, in Mr. Allen's office, some eight months after the execution of the will, and just before the division of the $15,500.  The witnesses to it were Stephen B. Coburn and James M. Loweree.  Mr. Loweree is dead.  Mr. Coburn, having been sworn, stated that he was called from his place of business by Mr. Allen ; that he remembers that Messrs. Allen, Loweree and McCoon and some ladies were in Allen's office.  His remembrance seems to be indistinct, and he does not speak as to the condition of William McCoon.

Robert Allen, Jr., says that the codicil was drawn at his office in Red Bank ; that while it was being drawn Mrs. Townsend and William McCoon were present, and after it had been prepared the witnesses to it were called in.  He states that McCoon told him what the codicil was to contain, and that he does not remember that Mrs. Townsend said anything about that instrument.

Mrs. Townsend is dead, and her testimony is consequently lost.

I think that the proofs establish that William McCoon was possessed of limited capacity.  He knew little or nothing about

business matters, and possibly did not fully appreciate the value
of his estate, yet in every-day matters belonging to his surround-
ings, he could manage for himself. He could bargain for such
familiar articles as harness or carriages, and could so purchase
from the shopkeepers in the place of his residence as to impress
them that he had capacity for business. His brother Cornelius
had failed to make a business man of him. To his sister-in-law
he seemed to be as immature as a boy, and his brother-in-law,
William H. Townsend, was satisfied that he could not care for
his own property. He, indeed, showed so little ability to pro-
tect his property that, as has been seen, he was readily persuaded
to put his first inheritance in trust and to give away that which
came to him later.

His letter to Cornelius McCoon, in reference to the trust deed,
exhibits a most suspicious weakness and uncertainty, while the
letter to Edwin S. Townsend, after the division of the $15,500,
indicates both strength and understanding. I am not unmindful
that it is insisted that these letters are really fabrications of
others. The first, I think, could hardly have been written for
McCoon to copy. Whether that letter be an original production
or the result of instruction from others, it shows an imperfect
appreciation of the subject upon which he was writing, and
betrays an ignorance of business. The contrast between the two
letters is so marked that it certainly justifies a suspicion that
they are not the productions of the same author. But I cannot
say that McCoon did not possess testamentary capacity under the
test established in this State. In the case of *Waddington* v.
*Buzby, 18 Stew. Eq. 173,* decided in the court of errors and ap-
peals, the decision of the ordinary is criticised because sufficient
weight was not given to the "moderate capacity" required of a
testator in this State. The test of capacity laid down in that
case is, whether, at the execution of a will, the testator can com-
prehend the property he is about to dispose of and the objects of
his bounty, and at the same time understand the nature of the
business in which he is engaged, and the manner in which the
will distributes his property.

The evidence fails to satisfy me that William McCoon did not possess the requirements of this test. He certainly knew that his property was of some value, although perhaps he did not appreciate its full value, and could not manage it with commendable business sagacity. There is ample evidence that he knew his relatives and could appreciate his obligations to those who immediately ministered to his personal wants, although it may be doubted whether, in his ignorance of business affairs, he could appreciate the services that his brother Cornelius had rendered him. According to the uncontradicted testimony of Mr. Allen, he understood the nature of the business in which he was engaged, and the manner in which the will distributed his property. The presumption of law is in favor of capacity. *Elkinton* v. *Brick, 17 Stew. Eq. 154.*

My greatest difficulty has been with the question of undue influence. I feel that the testator was induced to make division of that which he received from his sisters' estates, and I fear that the same influence was exerted in the making of the codicil, and possibly in the making of the will itself, but I cannot say that the influence to which he was subjected was undue, that is, such as to destroy his free agency, and cause him to do that which it was against his will to do and which he would not have done but for it. It seems unnatural that he should have discriminated against a brother and sister who had never wronged him, and in favor of a sister and nephews who had never been conspicuous in their attentions to him. The presence of the favored sister and the absence of the ignored brother and sister at the crucial points of his proceedings, and the letters of Mr. Allen, who was the cousin and attorney of the Traffords, and the participation of Trafford and his wife, are *indicia* of undue influence, yet these acts are not incompatible with the testator's enjoyment of free agency. For some reason, which does not appear, he may voluntarily have determined to prefer Mrs. Townsend and her children to his brother and other sister. Every influence is not undue. Suggestion, and even persuasion, may be safely used with a testator, if they do not destroy free agency and amount to moral or physical coercion. *Elkinton* v. *Brick,*

*17 Stew. Eq. 154, 165.* No rule can be laid down to define the limit of legitimate influence. Each case must depend upon, and be determined by the circumstances and conditions which surround it. Frequently the acts and conduct of favored legatees may be of such a character as to throw upon them the burden of establishing affirmatively the free agency of the testator, but in this case I think that there is not enough in the circumstances immediately connected with the making of these instruments to cast that burden upon those who take under the will. The suspicious circumstances which are adverted to as *indicia* of undue influence occurred eight months after the will had been made, and when the testator's testamentary intentions had been defined, and point rather to fraud or undue influence in the division of the $15,500 than in the production of testamentary provisions. It is true they were happening when the codicil was executed, but that instrument merely assured a direction previously given to the residuary estate by providing against a lapse by death. Suspicions must not be allowed to be substituted for proofs.

As the proofs stand, the decree of the orphans court must be affirmed.