CHARLOTTE B. ROBBINS and EDMUND P. ROBBINS, appellants,

v.

FREDERICK C. ROBBINS, respondent.

1. Publication of a will may be made by act or sign as well as by words. All that is required is that the testator shall make known clearly, in any way by which one mind can communicate with another, that the writing which he desires the subscribing witnesses to attest is his will.

2. Where a testator has previously told the subscribing witnesses that he intends to execute his will at a certain time and place, and requests them to attend to witness its execution, an act done or sign made by him in their presence, at the time and place appointed, may be so unmistakable in its significance as to speak to them as plainly as any oral declaration he could make.

3. A person who, from inattention or abstraction, is unconscious and insensible of what is being done and said when publication is made, does not witness it, and cannot, of course, testify that it was made.

---

On appeal from the decree of the orphans court of Camden county.

Mr. Alfred Hugg and Mr. Samuel H. Grey, for the appellants.

Mr. Alfred Moore (of Philadelphia) and Mr. Thomas E. French, for the respondent.

THE VICE-ORDINARY.

The appellants seek a reversal of a decree made by the orphans court of the county of Camden on the 9th day of Feb-

ruary, 1893, admitting the will of Harrison Robbins, deceased, to probate. In the court below probate was resisted on two grounds—*first,* that the will was the product of undue influence; and, *second,* that it had not been published in the manner required by the statute—that is, in the joint presence of the subscribing witnesses. On the argument here, the first ground was abandoned, it being admitted that the proofs were insufficient to establish it. So that but a single question is presented for decision, and that is, Was the will in question published in the manner prescribed by the statute?

Publication is essential to the validity of a will. To comply with the statute a testator must declare the writing which he executes as his will "to be his last will, in the presence of two witnesses, present at the same time, who shall subscribe their names thereto as witnesses." *Rev. p. 1247 § 22.* He may do so, however, by act or sign as well as by words, if the act he does or the sign he makes clearly indicates the character of the instrument. The statute does not require that publication shall be made by words alone; any act or sign by which the testator makes known to the subscribing witnesses that he executes the paper as his will is enough. Chancellor Williamson, as surrogate-general, said, in *Mundy* v. *Mundy, 2 McCart. 290, 293 :* "The scrivener, in the presence of the testator, says this is the will of A. B. and he desires you to witness it—the testator standing by—is a sufficient publication or declaration. The form is immaterial. But the witnesses must know it is the will of the testator they are witnessing, and they must witness it at his request." The present surrogate-general gave a like exposition of this requirement of the statute in *Elkinton* v. *Brick, 17 Stew. Eq. 154, 167,* where he said a sufficient publication is made to comply with the statute "when enough is said or done, in the presence and with the knowledge of the testator, to give the witnesses to understand distinctly that the testator desires them to know that the paper is his will and that they are to attest it." And Mr. Justice Scudder, speaking for the court of errors and appeals, in *Ludlow* v. *Ludlow, 9 Stew. Eq. 597, 601,* said, in substance, that it was not necessary that a testator

should, by his own words, declare the writing to be his will, but that if by sign or act he clearly manifests to the attesting witnesses that he desires them to attest the paper as his will, such sign or act will constitute a publication. Mere form in such transactions is a thing of very slight importance; the substance is the thing which must be regarded, and that consists in the testator's making known, clearly and distinctly, in any way by which one mind can communicate with another, that the paper which he desires the subscribing witnesses to attest is his will.

To illustrate by example: Suppose A gives his counsel instructions in the morning to draw his will and bring it to his house at five o'clock in the afternoon for execution, and then goes to his neighbor and says: "I am going to execute my will at five o'clock this afternoon; my lawyer will be there at that time with the will; I want you and he to sign it as witnesses;" the neighbor appears at A's house at the time appointed; he finds the lawyer there, and A, soon after his neighbor's appearance, produces a paper which he signs in the presence of both witnesses, and then, on rising from his chair, hands the paper to his neighbor, saying: "Sit here while you sign," and after his neighbor has signed the paper, A says to the lawyer: "Now you sign," and the lawyer does so, and this embraces all that is said and done while the three are together, could there be a doubt, looking at the transaction in its entirety, that the witnesses clearly and distinctly understood, and were bound to understand, from A's acts, considered in connection with what had previously occurred, that he executed that paper as his will? All that the statute requires, in respect to publication, is that the testator shall make known to the subscribing witnesses, at the time of execution, that he executes the paper as his will. It is true that a will cannot be published before it is written, nor in the absence of the writing itself, but the previous knowledge of the subscribing witnesses, communicated by the testator himself, may impart to an act done or a sign made by him when he comes to execute his will a meaning as clear, certain and definite as the most lucid words would express, but which, to a person without

such previous knowledge, would be unmeaning or at best ambiguous. In the case supposed the knowledge of the subscribing witnesses, respecting the purpose for which A wanted them to come to his house, made his acts, in producing the will, signing it and then handing it to one of them to sign, so unmistakable in their significance, that his meaning was made as plain and as certain to them as he could have made it by any oral declaration.

The will in question was executed on the 31st day of May, 1892, while the testator was suffering from an illness of which he died on the 11th day of June following. Three persons, besides himself, were present at its execution, namely, his physician, his counsel and his son Frederick. He had instructed his counsel the evening before to draw his will and to bring it to him on the afternoon of the 31st for execution. Either on the morning of the 31st, or during the day before, he had told his physician that he intended to execute his will on the afternoon of the 31st and that he wanted him to be present to witness its execution. The hour named was five o'clock or half-past five. On the afternoon of the 31st the testator's counsel reached his house first. The will had been read before the physician came. The physician and the testator's son entered the testator's room together. All three agreed that the testator signed the will in the presence of his physician and counsel. It is undisputed that when he signed he sat in a rocking chair and wrote his name with the will lying on a board or book resting on his legs, and that while he was making his signature his physician and counsel sat directly in front of him. It also appears that when his signature was completed, he handed the will to his physician, who carried it to a table, standing near the testator, and there signed it, and that his counsel then at once signed it as the other subscribing witness. The evidence of the counsel and the son shows a full and perfect publication by the testator immediately after he signed. The fact that a sufficient publication was made, by words, to entitle the will to probate is established, I think, beyond doubt. Indeed, I may say I cannot conceive how any upright, competent and careful lawyer could, under the special circumstances of this case, have allowed so essential a part of

the business in which he was engaged, and which it was his duty. to see was successfully done, to be overlooked or omitted as publication. He swears positively that he did not and I believe he speaks the truth. The physician, however, says that he did not hear the publication, and that if it was made, it was made in such manner that it did not come to his knowledge. He further says, that the only knowledge he had, when he signed, that the paper he was signing was the will of the testator, was such as the testator had communicated to him when he requested him to be present at the execution of his will. He testified, quite positively, that while the will was in course of execution no allusion was made by anybody to the distinctive character of the paper. So positive was he on this point that he said: "I signed it entirely by inference." Now, if from inattention or abstraction he was wholly unconscious and insensible of what was being said and done when publication was made, he could not, of course, know that it had been made. With his mind in that condition, he would have been mindless or oblivious to the publication, and though it was made in his presence, and would, but for his insensibility, have passed into mind, and thus become a part of his knowledge, still, as it was, he neither comprehended nor perceived it, and consequently never witnessed it, and could not, therefore, bear testimony to it. With affairs in this condition, it seems to me, the contention would be well nigh unanswerable, that although two persons had signed as attesting witnesses, there was in fact but one, the other, owing to his insensibility to the transaction, being just as ignorant of it as though it had occurred in his absence. It is the mind, and not the body, that must be the witness in such cases.

But there is no proof of inattention or abstraction on the part of the doctor. If there had been, it would have been very difficult to believe it. The testator had been warned by the doctor that his days on earth were probably numbered, and he had also advised the testator that it would be prudent for him to arrange his earthly affairs. Under the influence of this admonition, the testator had requested the doctor to be present to attest the execution of his will, and the doctor had promised that he would.

When, therefore, he came into the testator's presence on the afternoon of May 31st, he undoubtedly believed that he was about to become a witness to a solemn and important act to be done by a patient under a fear of speedy death. In such a situation it is not possible to believe that he would have allowed his attention to be diverted or his mind to stray. His evidence shows that he did not. In reply to a question, requiring him to state what the testator said at the time of the execution of the will, he said:

"I do not remember that he made any special remarks, except relative to getting me a pen and ink, or 'where will the doctor sign it?' I think he asked his son to light the lamp or start a light. It was just about dusk, as near as I remember, but beyond that I remember his anxiety about giving me a pen and where I would sign it."

He also, in a subsequent part of his testimony, in reply to a question requiring him to state whether the testator said anything while executing his will, said:

"I have no recollection of any remarks beyond common conversation—his anxiety to get a light or have me placed in a position to sign, and I remember a remark of this kind, that he did not know whether his hand was steady enough to sign himself."

He was then asked, whether when the will was handed to the testator to sign, his counsel did not make some statements to him, to which he replied: "Some remarks were made; I do not remember them; they were very short, a very few words." Immediately following this answer, a question in this form was put: "There was something said?" to which the reply was: "Yes, you spoke; there was some conversation." But what was said in this conversation by either party was not disclosed. The nature of the transaction in which the parties were engaged leaves no doubt, however, that it could have related to but one subject, and that was the will.

This summary of the doctor's evidence, respecting what occurred at the decisive moment in this transaction, shows not only that he was not unconscious of what was transpiring, but also, I

think, that he is unable to affirm the fact of publication, not because it did not occur but because he has forgotten it. True, only about four months elapsed between the date when the will was executed and the date when the doctor testified—a period too short, according to ordinary experience and observation, for a material fact, in an important transaction, to fade from the memory of a person who was under a special duty to remember it—but then it must be kept in mind that it appears by the doctor's own evidence, that his recollection, when he testified, respecting certain parts of this transaction was already in a faded and confused state. The fact has already been mentioned, that although he remembers when the will was handed to the testator to sign, his counsel made some remarks, consisting of a few words only, still he was compelled to say that he did not remember them. And such would also appear to have been the condition of his memory respecting the conversation which took place between the testator and his counsel about the time that the testator signed the will. He says, there was some conversation, but does not tell what it was. He does, however, say that if it consisted of a publication of the will he did not hear it. How he can truthfully speak thus is beyond my comprehension. If it be true that he does not remember the conversation he can tell nothing about it—neither what it was, nor what it was not. When first asked whether the testator signed the will before he did, he answered that he was under the impression that he did not, but afterwards he said it came to him, to speak in his own words, "in giving it most careful thought," that the testator signed first. And so, too, in fixing the time when the testator requested him to be present at the execution of his will, he twice gave the time as in the forepart of the day, obviously meaning the forepart of May 31st, but he subsequently testified that the request was made on May 30th, and that, in consequence, he did not make a professional visit to the testator on May 31st in the morning, but deferred his call until he went to witness the execution of the will.

These instances of failure and confusion of recollection demonstrate very clearly, I think, that the doctor's memory cannot be

trusted, and render it tolerably certain that when he says he did not hear the will published, he may utter what he believes to be true, but does so under a mistake resulting from forgetfulness. It is important to observe that the part of the transaction which he omits, from want of recollection, is just at the point where the other witnesses swear that publication occurred. Though the attestation clause of the will is perfect, it is, under the special circumstances of this case, without probative force against the doctor's evidence. He swears he did not read it and it is admitted that it was not read to him. My conclusion is, that the fact of publication was sufficiently proved to entitle the will to probate. In my judgment it is shown, by a clear preponderance of the evidence, that the will was duly published by words; but if this had not been so, I am of opinion, that it was sufficiently published by the acts of the testator, considered in connection with and interpreted by what the testator had, only a few hours previous to its execution, said to the subscribing witnesses, to entitle it to probate.

The decree of the orphans court will be affirmed.