This is an appeal from an order of the Ocean county orphans court denying probate of the alleged last will and testament of James D. Halton, deceased, and from the allowance of counsel fees to the proctors for the caveatrix-respondent. The appeal also brings up for review an order of the Ocean county orphans court directing the administrator pendente lite to pay to the widow of the decedent an undetermined amount sufficient to pay outstanding bills for necessities incurred by the widow between the date of the decedent's death and the entry of said order on March 31st, 1932, and also directing said administrator to pay the said widow $50 per week "for her support and maintenance," "from the income accruing to her interest in said estate." The widow, Mae U. Halton, filed a caveat against the probate of the alleged will, which was drawn by Thomas H. Halton, a brother of the decedent, at about nine A.M. on May 6th, 1930, in the decedent's room at Paul Kimball Hospital, Lakewood, New Jersey, a few moments before the decedent *Page 145 
was taken to the operating room of said hospital for an operation from which he subsequently died. The will is in the following form:
 "LAST WILL AND TESTAMENT OF JAMES D. HALTON.
I, James D. Halton being of sound mind do hereby bequeth to my wife May one-half of my total estate, after payment of debts, eighty per cent to be held in trust for her during her life and at her death to paid to my nephews and neices Thomas Halton, Jr., Elsie Halton Asbury, Thomas Lake and May Ellen Lake.
The remaining one half of my estate to be given to the nephews and neices above mentioned in equal portions.
My body to be cremated and the ashes scattered over Barnegat Bay.
Signed and witnessed this 6th day of May 1930.
Seal JAMES D. HALTON (Seal) Witnesses (Seal) Witness JULES BIERACH M D T.H. HALTON."
The grounds upon which this alleged will is attacked are stated by the court below to be:
1. That it was not executed in accordance with the statutory requirements.
2. Mental incapacity of the decedent.
3. That it was the product of undue influence.
The orphans court decided that the will was not executed in accordance with the statutory requirements and denied probate on that ground alone, and for that reason deemed it unnecessary to pass upon the other two grounds of attack.
I have carefully read and considered the voluminous testimony taken below, together with that taken in this court on this appeal, and have also considered the briefs of counsel.
I will now dispose of the grounds of attack on the alleged will in the inverse order of their statement by the orphans court.
 I. UNDUE INFLUENCE.
There is, in the whole record, not a scintilla of evidence indicating that the alleged will was the product of any influence, undue or otherwise, exerted upon the mind of the *Page 146 
decedent by any person or persons, and this ground of attack may be dismissed without further consideration.
 II. MENTAL INCAPACITY.
The presumption of law is in favor of testamentary capacity and those who insist upon the contrary have the burden of proof.Whitenack v. Stryker, 2 N.J. Eq. 8; Elkinton v. Brick,44 N.J. Eq. 154; McCoon v. Allen, 45 N.J. Eq. 708; In re Craft'sEstate, 85 N.J. Eq. 125; In re Shimer's Will, 103 Atl. Rep. 383;1 Underh. 106 ¶ 86.
In the court below there was the usual array of medical experts, some of whom testified that the defendant was of insufficient mental capacity to make a will, and others of whom testified that he was fully capable. In number these witnesses were about equally divided. Other witnesses also expressed their opinions of the decedent's mental capacity; but the court is not obliged to accept the opinion of any witness or group of witnesses, medical or otherwise. In Loveridge v. Brown,98 N.J. Eq. 381, the court of errors and appeals, adopting the opinion of Judge Flanagan of the Essex county orphans court, held that such abstract opinions were of no importance, and "that no judicial tribunal would be justified in deciding against the capacity of a testator upon the mere opinion of witnesses, however numerous or respectable. The opinion of a witness must be brought to the test of facts, that the court may judge to what weight the opinion is entitled." See, also, Stackhouse v.Horton, 15 N.J. Eq. 202 (at p. 208); Waddington v. Buzby,45 N.J. Eq. 173. The question of testamentary capacity is one of fact to be determined by the court, and opinions, expert or otherwise, are mere aids to the court in reaching such determination but are in no sense binding. In view of the facts disclosed by the record, I have no hesitancy in saying that the decedent was mentally competent to make a will at the time the paper-writing here involved was prepared and executed. This finding is not necessarily any reflection upon those expert *Page 147 
medical men who gave it as their opinion that the decedent was incompetent to make a will. Their opinions, and, indeed, I think the opinions of most, if not all, of the medical experts who testified on this point, were apparently based upon a mistaken idea of what constitutes testamentary capacity. As is usual in cases of this kind, the hypothetical questions propounded in the court below to these experts were couched in impressive language, which, I think, tended to magnify the thought that an extraordinary, or at least an ordinary mentality is required for testamentary capacity. This impression often results from the continued repetition of such words as "sound and disposing mind and memory," "comprehension of the character, nature and location of his property and the natural objects of his bounty," and the like formulae, by the lawyers engaged in the trial of the cause and by the court until witnesses easily, but perhaps unconsciously, become imbued with the idea that the word "sound," as applied to "a disposing mind and memory," means "whole, unbroken, unimpaired, unshattered by disease or otherwise," a phrase the subject of review in Den v. Johnson, 5 N.J.L.
[*]454 (1819); but that phrase has never had the approval of this court, nor the unqualified approval of any court in this state. On the contrary, more than a century ago, it was disapproved by this court in Sloan v. Maxwell, 3 N.J. Eq. 563
(at p. 568), where Chancellor Vroom said that if such was the test of testamentary capacity "a will can only be made in the spring, or at the latest in the summer, and never in the autumn of life."
As early as January, 1831, the test of testamentary capacity, as laid down by Judge Washington in Den v. Van Cleve, 4 Wash.C.C. Rep. 262, 267, was adopted by this court. Sloan v.Maxwell, supra; Lowe v. Williamson, 2 N.J. Eq. 82. That test is as follows:
"He (the testator) must, in the language of the law, be possessed of sound and disposing mind and memory. He must have memory. A man in whom this faculty is totally extinguished, cannot be said to possess understanding to any degree whatever, or for any purpose. But his *Page 148 
memory may be very imperfect; it may be greatly impaired by age or disease; he may not be able, at all times, to recollect the names, the persons or the families of those with whom he had been intimately acquainted; may at times ask idle questions, and repeat those which had before been asked and answered, and yet his understanding may be sufficiently sound for many of the ordinary transactions of life. He may not have sufficient strength of memory and vigor of intellect to make and digest all the parts of a contract, and yet be competent to direct the distribution of his property by will. This is a subject which he may possibly have often thought of, and there is probably no person who has not arranged such a disposition in his mind before he committed it to writing. The question is not so much what was the degree of memory possessed by the testator, as this — Had he a disposing memory? Was he capable of recollecting the property he was about to bequeath, the manner of distributing it, and the objects of his bounty? To sum up the whole in the most simple and intelligible form, were his mind and memory sufficiently sound to enable him to know and understand the business in which he was engaged at the time when he executed his will?"
This rule, in substance, but in varying form, has since been repeatedly restated in our courts, in decisions too numerous to mention, but amongst which are Whitenack v. Stryker, supra;Boylan v. Meeker, 15 N.J. Eq. 310; Clifton v. Clifton,47 N.J. Eq. 227; In re Williams' Will, 95 N.J. Eq. 702; Loveridge
v. Brown, supra; In re Haness' Estate, 98 N.J. Eq. 645; In reWilson's Will, 107 N.J. Eq. 604; In re Freeman,1 N.J. Mis. R. 642.
In In re Haness' Estate, supra, Vice-Ordinary Fielder said: "Our courts guard the right of testamentary disposition jealously. They hold that this right may be exercised by a person of very moderate capacity." (Italics mine.) In Loveridge v.Brown, supra, the court said: "The standard of testamentary capacity has been fixed at a very low point in the scale ofintelligence" (Italics mine), a phrase evidently originating inMoore's Ex'rs v. Blauvelt, 15 N.J. Eq. 367 *Page 149 
(at p. 384). In In re Wilson's Will, supra, Vice-Ordinary Lewis said: "The mental capacity requisite to make a will isvery low." (Italics mine.) And the text in 1 Jarm. Wills
(5th ed.) 38, reads: "It is not perfect sanity, however, but only a mind that comprehends the testamentary act that is required." It is this test of testamentary capacity, adopted in this court more than a century ago, which must be applied in the instant cause. It apparently was not applied by these medical experts, most of whom I know intimately, and for whom I have the highest respect, as upon no other theory can their opinions that the decedent lacked testamentary capacity be satisfactorily explained. One other reason for the adverse opinion of some of these experts suggests itself, in that most of them, when giving their opinions, assumed that the decedent had had two hypodermic injections of morphia or other drugs within the space of a half hour prior to the preparation and execution of the alleged will, the last of which was supposed to have been a few moments before the will was drawn; but as I read the testimony, that is not so. The will was drawn at nine o'clock on the morning of May 6th, 1930, or a few moments later. The last hypodermic preceding the patient's removal to the operating room was after nine-fifteen A.M. and after the preparation and execution of the alleged will. It is true that the nurse's record shows that this was administered at nine A.M.; but the records of Miss Doud, the hospital superintendent, who had the custody of the drugs which were used, show that she did not give the tablet for the hypodermic to Nurse Pearsall until nine-fifteen A.M., and Nurse Lane saw Nurse Pearsall outside the patient's room with the hypodermic needle wrapped in cotton between nine-fifteen and nine-twenty. This was after Nurse Lane had attempted to go into the room and was sent out because the will was then being prepared. And Nurse Pearsall is not positive as to the exact moment that the hypodermic injection was given. She says it was approximately nine o'clock. Her record contains the following notation: "9 A.M. Hypo. Hyoscine-Morph. Sulp. Ct. grs. 1/200 Visited by Dr. Boyer and assistant." *Page 150 
Dr. Boyer and his assistant did visit the patient at nine A.M., talked with him, discussed with Dr. Bierach the patient's condition and inquired about previous hypodermics and said he should be given another. The doctors then went to the washroom to "scrub up" for the operation. It was while they were there that Nurse Pearsall came and told them she could not get the drug prescribed by Dr. Boyer and asked if another combination of drugs, which she mentioned, would answer the purpose. On being told that it would, she returned to the superintendent's office, obtained the substitute and proceeded to the patient's room where she found Nurse Lane and Dr. Bierach standing outside the door. It is plain that if her record is correct as to the time Dr. Boyer and his assistant visited the patient, and I am sure it is, it is incorrect as to the time of the hypodermic injection. So, I think it is clear that this hypodermic was not administered until after the alleged will was executed. Only one hypodermic injection, which was a very mild one, was had before that time on that day.
It has been repeatedly held in this state that "a will may be contrary to the principles of justice and humanity; its provisions may be shockingly unnatural and extremely unjust," nevertheless, if it appears to have been made by a person of sufficient age to be competent to make a will, and also to be the free and unconstrained product of a sound mind, the courts are bound to uphold it." Middleditch v. Williams, 45 N.J. Eq. 726;In re Young, 90 N.J. Eq. 236; In re Haness' Estate, supra. AndIn re Young, supra, the court of errors and appeals said: "It is as much the duty of the court to uphold the right of the owner of property to dispose of it by will as she pleases, as it is to see that she is not imposed upon in the exercise of that right." Consequently, this court will not reject a will merely because its provisions appear to the court to be unconscionable, unnatural or unjust; to do so would be to substitute the court's judgment for that of the testator whose right it is to dispose of his property as he pleases, unrestricted except by the law of his domicile. *Page 151 
The extent to which our courts have gone in jealously guarding the right of testamentary disposition is well shown by the statement of the court in Boylan v. Meeker, supra, that "indeed, while the weight of the evidence is, I think, clearly in favor of his capacity when in ordinary health and free from causes of excitement, yet it was, no doubt to some extent, a fluctuating capacity, greatly impaired at times, and occasionally sinking into the imbecility of second childhood." And yet the court found testamentary capacity was not lacking.
Tested by the rule applicable here I have no hesitancy in saying that the decedent had full testamentary capacity.
 III. EXECUTION OF WILL.
The alleged will bears no attestation clause, but is subscribed by two witnesses to the signature of the decedent. In the absence of such a clause the burden is upon the proponent to affirmatively prove that all the requirements of the statute have been met. Mundy v. Mundy, 15 N.J. Eq. 290; Swain v. Edmunds,53 N.J. Eq. 142; Stewart v. Stewart, 56 N.J. Eq. 761; Vernon
v. Vernon, 69 N.J. Eq. 759; In re Johnson's Will, 80 N.J. Eq. 525; Allaire v. Allaire, 37 N.J. Law 312. The requisite formalities prescribed by our Wills act are stated by the court of errors and appeals to be: "First, that the will shall be in writing; second, that it be signed by the testator; third, that the signature of the testator shall either be made or acknowledged by him in the presence of two witnesses who shall be present at the same time; fourth, that the writing shall be declared by the testator to be his last will, in the presence of those witnesses, present at the same time as aforesaid; and fifth, that the two witnesses shall subscribe their names thereto in the presence of the testator." Bioren v. Nesler, 77 N.J. Eq. 560.
See, also, In re McElwaine's Will, 18 N.J. Eq. 499. *Page 152 
Everything required to be done by the testator must precede, in point of time, the subscription of the testamentary witnesses.Lacey v. Dodds, 63 N.J. Eq. 325; In re Mannion's Estate,86 N.J. Eq. 232; In re Sutterlin's Will, 99 N.J. Eq. 363; In reBullivant's Will, 82 N.J. Eq. 340. It is not necessary that the testator actually sign in the presence of the witnesses, or that they actually see him sign the will, providing he acknowledges the signature to the will to be his in the presence of both witnesses. Ludlow v. Ludlow, 36 N.J. Eq. 597; Stewart v.Stewart, supra; In re Bullivant's Will, supra; Mundy v. Mundy,supra.
There is a sufficient publication of the will when enough is said or done in the presence and with the knowledge of the testator to give the witnesses to understand distinctly that the testator desires them to know that the paper produced is his will which they are to attest as such, and such publication may be by words, acts or signs, and no particular formality is required.Darnell v. Buzby, 50 N.J. Eq. 725; Robbins v. Robbins,50 N.J. Eq. 742; Vernon v. Vernon, supra. The testator may declare the writing to be his will before, or after, orcontemporaneously with the making or acknowledgment of the signature; but the document is not complete until the testator has signed or acknowledged his signature, and declared the paper to be his will, and the attesting witnesses have also duly subscribed. In re Mannion's Estate, supra.
One of the subscribing witnesses, Thomas H. Halton, testified clearly and explicitly to the compliance with every requisite statutory formality in the execution of the alleged will, while the other subscribing witness, Dr. Bierach, testified that the paper-writing was neither signed in his presence nor the signature thereto acknowledged by the decedent; that he was not requested by the testator to sign as a witness; that he did not know that the paper which he signed as a witness was supposed to be a will, and that the decedent did not in any manner declare it to be his will until after both witnesses had signed. The court below accepted the testimony of this latter witness because, "having observed *Page 153 
the witnesses as they testified in court and having noted their demeanor on the stand and their manner of response" it was evidently considered that it was to be preferred to the testimony of Thomas Halton, because this witness had no apparent pecuniary interest in the controversy, while Thomas Halton was indirectly interested, because he drew the alleged will which provided for the eventual distribution of the greater bulk of the estate to his own son and daughter and to a nephew and niece. Ordinarily, with such a statement in the opinion of a lower court, an appellate court would be loath to disturb its finding of fact, and such a finding should not be disturbed by the appellate court unless it is clearly erroneous. Gunn v. Early, 71 N.J. Eq. 717.
On the other hand, if the conclusion of the lower court which resulted in the refusal of probate of the will is clearly erroneous, then the duty of the appellate court is plain and, although I have arrived at my decision reluctantly, for the reason stated, I feel that I have no alternative but to advise a decree reversing that of the Ocean county orphans court which denied probate of the alleged will.
Both the subscribing witnesses to this will testified before me at the final hearing on this appeal and thus I was afforded an opportunity to appraise them and their credibility. I saw nothing in the demeanor or conduct of the witness Halton, nor do I find anything anywhere in the record, which in any way reflects upon his credibility as a witness or which would lead me to give less weight to his testimony than to that of the other subscribing witness. On the other hand, as I shall attempt to show, the other subscribing witness is discredited out of his own mouth, and also by the testimony of other witnesses, as to whose veracity I entertain no doubt.
Dr. Bierach testified that until after both he and Thomas Halton had subscribed their names to the alleged will he had no knowledge that it was supposed to be a will. If that testimony is untrue, then all of his testimony may be thrown into the discard. A careful consideration of all the testimony with respect to what occurred at the Paul Kimball Hospital on the morning of May 6th, 1930, leads me to the conclusion *Page 154 
that he did know when he signed this paper that he was witnessing James D. Halton's will, and that his testimony to the contrary is false. Nurse Lane, a witness without guile, who testified in this court in a manner that compelled belief, said that the decedent told her the night before the operation that when his brother arrived in the morning he intended to make his will; that while the decedent was alone with his brother in his room at the hospital shortly after nine o'clock on the morning of May 6th, 1930, she attempted to go into the room and upon opening the door was told by James Halton to "get out" and that at that time Thomas Halton was writing on a sheet of paper; that she immediately closed the door and stood outside of it; that when Dr. Bierach appeared and was about to go into the room she stopped him and told him that he could not go in because the patient was making his will; that while they were standing there Nurse Pearsall came with the hypodermic needle and that he then told Nurse Pearsall that she could not go in as Mr. Halton was making his will. Nurse Lane also testified that he finally went into the patient's room, coming out just before the patient was taken into the operating room, and that he then told her and Mrs. Halton, and possibly another nurse, that Mr. Halton had just made his will. She also testified that she went into the patient's room shortly after Dr. Bierach entered and saw him standing by the side of the bed with a magazine in his hand. Dr. Bierach himself says that the will was on a magazine when it was handed to him and when he subscribed his name thereto. He testified that when he went into the patient's room Thomas Halton told him that he wanted him to witness "a paper;" that he then handed him a paper on a magazine; that the paper was folded over so that he could see nothing that was written upon it except the signature of James Halton; that he, Dr. Bierach, then wrote the word "witness," signed it and handed it back to Thomas Halton, who wrote his name thereon and then handed it to the decedent, asked him if it was his will and if he desired them to witness it, to which the decedent answers with "a couple of yesses." Thomas Halton testified *Page 155 
that when Dr. Bierach entered the room he asked him to witness the decedent's will; that he then placed the will upon a magazine and handed it to his brother, who signed it, first making a seal in front of his name, and then two seals after his name; that he, Thomas, then asked James D. Halton if the paper-writing was his will, and he said "Yes;" asked him if he desired them to witness it, and he said "Yes;" that James then handed the magazine, with the will upon it, to Dr. Bierach, and asked him to sign it as a witness, which he did; that Thomas Halton then, at his brother's request, signed it as a witness; that all three were present at the same time and that both witnesses saw the decedent sign and that the decedent saw both witnesses sign. Dr. Bierach admits that after he came into the room James Halton had the paper in his hands and made thereon the circles or seals which appear after his name; but insists that this was after he had signed as a witness. In this I think the doctor is in error. It is to be noted that Nurse Lane entered the decedent's room while Dr. Bierach still had the will in his possession and on the magazine. She was in the room for a sufficient length of time to have heard the conversation which Dr. Bierach alleges took place after he had witnessed the will and to have seen the will returned to the decedent had that occurred; but she saw and heard nothing of the kind. Assuming, however, that the will had already been signed by James Halton when Dr. Bierach was asked to witness it, I think the subsequent affixing of the seal after his name was a sufficient acknowledgment of the signature by the testator to comply with the statute, even though no words were spoken.Darnell v. Buzby, supra; Robbins v. Robbins, supra. "A publication may be inferred from the actions of the testator alone." Farley v. Farley, 50 N.J. Eq. 434. But that the paper was published and declared by the decedent to be his will in response to questions of his brother, is admitted; it is only the time of such publication that is in dispute. I believe that Thomas Halton states the truth when he says that this occurred before either he or Dr. Bierach subscribed *Page 156 
their names as witnesses. On cross-examination Dr. Bierach gave the following significant testimony:
"Q. When you came back to the patient's room why did you wait outside? A. I was told I could not get in.
Q. Didn't Nurse Pearsall say something about what was going on in there? A. No, Nurse Lane.
Q. What did you say to Nurse Pearsall when she came there? A. I told her not to go in.
Q. Why? A. Because Nurse Lane had told me that Jim had told her to stay out.
Q. Did she say why? A. She said he had yelled at her to go out and shut the door; she said, `I think he is making his will.'
Q. Was Nurse Lane correct when she told you not to go in, he was making his will? A. She said `I think.'
Q. When was this? A. At 9:20, when I came back from the scrub room.
Q. Can you tell us now just what the conversation with Nurse Lane was? A. When I came back from the scrub room at 9:20 Mrs. Lane said `Mr. Halton won't let you in there. I think they are making a will. He told me to stay out.' I went down into the sun room and sat there.
Q. Didn't she say `He is making his will?' A. As I recall she said `I think they are making a will.'
Q. And you told Nurse Pearsall not to go in because Mr. Halton was making his will? A. No. I relayed the message to her that Nurse Lane had given me, that she thought they were making a will.
Q. So you knew before you went in there was something doing about making a will? A. Yes, but thinking and knowing are two different things.
Q. When you went in the room and they produced a paper that you were to witness, didn't you know it was a will? A. No, I did not.
Q. You said on direct examination that James D. Halton replied `yes' when his brother went to the deceased and said `Jim, this is your last will and testament.' A. Yes, that was after he signed. *Page 157 
 Q. What did you think you were signing? A. I was witnessing his signature to a piece of paper folded up.
Q. You had it entirely in your possession? A. It was handed to me on a magazine.
Q. You wrote your name on it while it was on the magazine? A. Yes.
Q. You saw James Halton's signature there? A. Yes.
Q. And you had already been told twice — that is, somebody had told you and you had told someone else something in regard to making a will, and James Halton afterwards said it was his will — is that right? A. No, Jim didn't say it was his will; he said `yes.'
Q. He said `yes' in reply to a question from his brother `Is this your last will and testament?' A. I did not say it was a question. It was a statement.
Q. You did not say anything to him about your not knowing it was a will? A. No. It did not make any difference to me."
I have no doubt that when the doctor went into James Halton's room he knew that a will was being prepared and he must have known that the paper which he was requested to sign as a witness was James Halton's will; by his denial of that knowledge he discredits himself. He is further discredited by both Mr. Davis and Mr. Hepburn, who testified that a few days after the testator's death, Dr. Bierach told them that the testator had told him that the paper which he then signed was his will and asked him to sign it as such, and that the doctor then said that Mr. Halton had made a mistake in placing the seal on the paper by placing it before instead of after his signature, and that he saw all three seals placed on the paper and that he saw the testator sign in the presence of the other witness, all three being then present.
This testimony is condemned by counsel for respondent because it was given by the proctors of record; but I think it was entirely proper under the circumstances. Dr. Bierach had unexpectedly proved to be a hostile witness, and it was quite appropriate that the court, conducting a judicial inquiry and not trying a civil cause, should be informed of any *Page 158 
facts which might affect his credibility. I have no reason to suppose that these lawyers, both of whom I have known for many years, would deliberately perjure themselves. And Dr. Bierach was not their witness, although of necessity called by them. He was a witness thrust upon them by the law and whose testimony was open to challenge by them. 1 Underh. 291 § 212.
If Dr. Bierach knew that the paper which he witnessed was the will of James D. Halton when he subscribed his name thereto, and I have not the slightest doubt that he did, then he is further discredited by his own testimony that the decedent was mentally incompetent to make a will at that time. If the decedent lacked testamentary capacity, Dr. Bierach knew it when he attested decedent's signature and by that act participated in a transaction fraught with the greatest possibilities for evil and injustice. Such conduct in a layman would be reprehensible; but in an attending physician, who is charged with greater responsibility, it merits sterner condemnation. If James Halton was incompetent, then in all reason the doctor should have protested against the execution of any such document. Why did he not do so?
In Garrison v. Garrison's Executors, 15 N.J. Eq. 266,
Chancellor Green, as ordinary, said that "a man who will subscribe an instrument attesting that the testator is of sound mind, memory and understanding and then repudiates, under oath, his own attestation clause, does not occupy a position that will justify a court in giving any weight to his own opinion." He then quoted from Jarm. Wills as follows: "The attesting witnesses to a will are regarded in the law as placed around the testator in order that no fraud may be practiced upon him in execution of the will and to ascertain and judge his capacity;" and while the chancellor refused to give effect to this principle to the extent of accepting the opinion of the witness as controlling on the question of testamentary capacity, I think it is plain that he considered a witness' repudiation of his own attestation clause as destructive of any weight which it might otherwise have had. I am in accord with this view. To the same effect is O'Brien *Page 159 
v. Dwyer, 45 N.J. Eq. 689; Stevens v. Leonard, 154 Ind. 67;56 N.E. Rep. 27; Scribner v. Crane, 2 Paige 147. See, also, 1Underh. Wills 293 ¶ 213, where the text reads, in part, as follows:
"And, as a matter of law, a person who as a subscribing witness goes upon the stand and upon his oath asserts to be false that which in the execution of the will he, by a most solemn act, asserted to be true, deserves to be discredited, and is worthy of but little belief."
Lord Mansfield was of the opinion that a subscribing witness impeaching his own act was deserving of the pillory. Warrington
v. Shelley, 1 T.R. 297, 300; see note 1 Underh. 293, at the bottom.
Under the circumstances I prefer to accept the testimony of Thomas H. Halton, who is in no way discredited, and I discard as of little weight the testimony of the other subscribing witness. It is true that Thomas Halton is indirectly interested in the outcome of this litigation, but there is nothing to indicate that that interest has affected his testimony in the slightest degree. On the other hand, while Dr. Bierach has no visible pecuniary interest, it is certain that he has evinced an interest in this cause transcending that of the ordinary witness, even to the extent of trying to prevent interviews by the proponent's counsel with prospective witnesses in the cause.
No case is found in this state where there are two witnesses to a will and no attestation clause, one witness testifying to the due execution of the will and the other to the omission of some legal formality, in which the will has been denied probate; but there is ample authority for admitting such a will to probate on the testimony of one subscribing where the circumstances are persuasive of its truth, as here.
In Swain v. Edmunds, 53 N.J. Eq. 142; affirmed, 54 N.J. Eq. 438,
the will had no attestation clause. One witness testified to the publication by the testatrix; the other witness said that the testatrix did not declare the paper to be her will and that she, the witness, did not know she was witnessing a will. The situation there before the court was *Page 160 
peculiarly like that here, and Chancellor McGill, sitting as ordinary, said:
"If the testimony is to be weighed merely by the number of witnesses, it is evenly balanced, and the case stands precisely as it stood before the offer of proofs. The burden cast upon the proponent has not been borne, and the will cannot be admitted to probate. But is the testimony of the witnesses of equal weight?"
He then discussed the testimony of the two witnesses to the will and finally accepted that of the witness who had testified to the observance of all due formalities. He practically discarded the testimony of the other witness, because there was evidence that she was interested in a book at that time, and, continuing, said:
"It appears to be a just conclusion that her absorption in the book which interested her was so great that her impression and remembrance of the transaction of the execution of the will, and particularly that part of it which was addressed to mental understanding, as distinguished from that which concerned the mere physical action of attending and signing, was slight, vague and uncertain. And I cannot but now conclude that when she was required to testify to it, in her efforts to remember that which was done and said, she recalled her physical acts, but fell into the error, as to the language used, which has led to the contradiction between her and Mr. Edmunds."
And so it might be said as to Dr. Bierach. He himself testified that he was intent upon getting the patient into the operating room precisely at nine-thirty; that that was his one thought; and "it appears to be a just conclusion" that he was so absorbed in his duties, so intent upon getting the patient into the operating room at the appointed time, that he fell into error as to what actually happened.
In In re Johnson's Will, supra, one witness testified to the due execution and publication of the alleged will while the other witness testified that the testator did not declare his will and did not request him to sign as a witness. The orphans court believed the first witness, discarded the testimony *Page 161 
of the other and admitted the will to probate. This was affirmed by the prerogative court and by the court of errors and appeals. The report of that case does not indicate whether or not the will bore an attestation clause; but inspection of the will itself discloses that it had none. See, also, Stewart v. Stewart,supra; Vernon v. Vernon, supra.
These are the only cases that I have been referred to, or which my own research has disclosed, in which a will without an attestation clause was involved and where the subscribing witnesses were not in agreement as to the due observance of all requisite formalities; but I think it may be said that, as a matter of law, the courts place very little, if any, reliance upon the testimony of a subscribing witness who testifies in contradiction to that to which he has previously certified by subscribing as a witness to a will. But there are other cases where the attestation clause was present; in some instances imperfect, in others perfect, and where the witnesses were not in accord, and the wills in controversy have been admitted to probate. See In re Beggans' Will, 68 N.J. Eq. 572; Robbins v.Robbins, supra; Mundy v. Mundy, supra; Compton v. Mitton,12 N.J. Law [*]70; In re Seymour's Will, 114 Atl. Rep. 799. "And in a case where the will was signed by the testatrix and two other persons (both of whom were dead) without any attestation clause, the rule `omnia prae sumuntur rite esse acta' enabled the court to hold the will duly executed." 1 Jarm. (7th ed.)110.
This appeal also brings up the question of the propriety of the counsel fees allowed to respective counsel by the orphans court. Counsel for the proponents were allowed a fee of $6,000, payable out of the estate, and this allowance is not challenged by anyone. It is technically in review because the appeal is from the whole decree of the lower court. In my judgment, the allowance is appropriate and justified, and will not be disturbed.
The orphans court allowed a counsel fee of $9,500 to counsel for the caveatrix and approved their expense account of *Page 162 
$2,118.18, to be paid out of the funds of the estate. By agreement of counsel, this counsel fee will be reduced to $6,000 and the expense item to $1,200. The value of the estate is variously estimated at from $148,000 to $172,000 and in view of the services performed by counsel for caveatrix, affidavit respecting which is on file in this court, the agreement of counsel respecting fees and expenses is approved. The caveatrix also took an appeal from that portion of the decree of the orphans court awarding counsel fee and expenses to her proctors. This appeal has been dismissed by consent.
The order of the orphans court directing payment of a lump sum for accumulated expenses and a weekly sum of $50 for support and maintenance of the caveatrix is also before this court on appeal. So far as the record discloses, there was nothing before the orphans court upon which any such order could have been made. While it is undoubtedly true that the caveatrix has an interest in this estate and is entitled to the income on at least one-half thereof there was nothing before the court to show what, if any, income had been received by the administrator pendente lite. It is assumed, of course, that there must be some income; but all the knowledge which either this court or the court below has or could have had is gleaned only from the remarks of counsel as they appear in the record, an insufficient basis for an order of this kind. It may be quite appropriate to direct the administrator pendente lite to pay to the caveatrix such portion of the income of the estate as to which no question can be raised, but no order to that effect should be entered until it is definitely determined what that income amounts to. This order will also be set aside. *Page 163